STATE OF MARYLAND *v.* ACTION TV RENTALS, INC. ET AL.

[No. 17 (Adv.), September Term, 1983.]

*Decided November 9, 1983.*

532

534

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*William Leibovici, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Cheri Wyron Levin, Assistant Attorney General,* on the brief, for appellant.

*John H. Doud, III,* with whom were *Fedder & Garten, P.A.* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

The principal question presented on this appeal is whether the Retail Installment Sales Act (RISA), Md. Code (1975, 1983 Repl. Vol.), Title 12, Subtitle 6 of the Commercial Law Article (CL) applies to the transactions of one of the appellees, Action TV Rentals, Inc. (Action). Action rents appliances on a week-to-week or month-to-month basis. If the customer, although not obliged to do so, regularly and timely makes a specified number of periodic payments, title to the property passes to the customer. We shall hold that, under the facts of this case, the transaction is not "an installment sale agreement" as defined in CL § 12-601 (l).

The State of Maryland, acting through the Consumer Protection Division of the Office of the Attorney General (the State), filed this case in equity in the Eighth Judicial Circuit under the Consumer Protection Act (CPA), Title 13 of the Commercial Law Article. The defendants with whom we are concerned on this appeal were Action, Samuel J. Wolf (Wolf),

the present owner and president of Action, and Michael R. Kent (Kent), formerly an owner and officer of Action.[1] Following a trial which began on April 9, 1981 and concluded on May 18, 1981, at which the State called 38 witnesses and the defendants called 22 witnesses, the chancellor granted certain injunctive and restitutionary relief and imposed civil fines totalling $19,200 on Action and additional fines totalling $1,200 on Wolf. The State appealed from the denial of certain additional relief requested by it. There is no cross-appeal. We issued the writ of certiorari on our own motion prior to consideration of the matter by the Court of Special Appeals.

Action rents televisions, stereos, and other major appliances under a contract which Action's brief labels as a " 'no obligation' rental agreement" and which the State calls a "rental purchase plan." In a comprehensive opinion the trial judge found that this type of transaction had originated in 1959 in Wichita, Kansas and had grown in popularity by the time of trial to some 300 dealers in 1,000 locations in 42 states renting a total of 900,000 television units, according to estimates by one witness from the industry. This type of business is characterized by the absence of a credit check, no deposit, free service, no obligation to rent beyond the weekly or monthly period initially contracted, and a provision that rental goes toward purchase. Action entered the field in Baltimore in 1975. It was founded by Wolf, Kent and a third individual, all of whom were former employees of the original Wichita entrepreneurs. The selection of Baltimore as the initial location for Action was influenced by the number of families in that area with a combined median income of between $10,000 and $12,000. Similar operations by Action's founders were commenced in Philadelphia, Virginia and Florida. In June 1980, Wolf sold all of his interest in the companies outside of Maryland to the other founders and he acquired all of their interests in Action. Action had four store locations and 32 employees at the time of trial.

---

1. Another corporation, Easy TV Rentals, Inc., was joined as a defendant below and is an appellee. However, the distinction between Action and Easy TV Rentals, Inc. is not material to the issues on this appeal.

To generate business, Action relies on radio, television and mass transit advertising. Illustrative of the rental terms is the form of agreement currently used for month-to-month rentals. In part it provides:

> TERMINATION BY RENTER: Renter at its option may at any time terminate this agreement by return of the property to owner in its present condition fair wear and tear excepted and by payment of all rental payments due on or during the month of termination. Renter is <u>required</u> to rent this equipment for only one month.
>
> . . . .
>
> TITLE: Title remains at all times in the owner during the time which this rental agreement is in effect. If renter chooses to rent this equipment for _____ consecutive (in a row) months at the equal monthly rental charge shown above, and fulfills all other terms and conditions of this agreement, title to the equipment shall at the end of _____ months be transferred to renter in the form of a paid receipt. The renter receives use and possession of the property for successive one-month terms so long as monthly rental payments are made on or before the due date and renter complies fully with all agreements and conditions hereof and unless this agreement is terminated as provided herein. [Underlining in original.]

The agreements do not set out the total of the payments which results in purchasing the appliance. For example, one of the weekly rental agreements placed in evidence, and covering a TV, calls for the payment of $16.00 per week. Title passes if those payments are made for 78 consecutive weeks (total of payments — $1,248). The trial court found that 18 months seemed to be the usual length of time over which periodic payments would have to be made in order for the consumer to acquire ownership of the rented property.

The particular item rented by Action to a given customer might be new or used; and the same periodic rent is charged by Action for comparable items, whether a given item is new or used. Under its rental agreement Action has the obligation to maintain the rented equipment at no additional charge. If Action is unable to make needed repairs in a customer's home within 24 hours of the request for service, it replaces the defective item with a functioning, comparable item. Such a substitution is known as a "switch-out."

Action had rented between 25,000 to 30,000 televisions from the inception of its business to the time of trial. The circuit court accepted statistics presented by Action reflecting that the average rental period for its customers is between three to four months and that only 24%-25% of those customers acquire title. When a customer acquires title, Action's maintenance obligation terminates with the termination of the rental agreement. If some portion of any manufacturer's warranty remains in effect when title passes from Action to a customer, Action assigns the warranty to the customer.

Under Action's type of transaction payment for the initial rental period is made upon, or in advance of, delivery of the rented property and, when the customer has not terminated, payment for any succeeding period is due in advance. Direct contact with customers, for the purpose of collecting past due rent, was made by routemen who also delivered and installed equipment for new accounts. If payment for a renewal period were not timely made, the routeman responsible for the account would first telephone the customer. Thereafter, if payment still had not been received within one week after a payment became due, the routeman was to go to the customer's home in order either to collect the amount necessary to bring the rental current or to repossess the appliance. Obviously critical to Action's business was the effecting of prompt repossession from those who failed to continue their rental payments. Indeed, Action established a ceiling, called the "close-rate," on overdue accounts. It was the ratio of a routeman's past due accounts to all accounts

assigned to that routeman. The trial court found this ratio was usually 6% and that the cutoff date as of which it was determined was ordinarily Saturday night of each week. A store manager was in turn responsible for meeting a similar, storewide close-rate.

Pressures were exerted down the managerial chain for managers and routemen to maintain their accounts below the close-rate. These pressures motivated improper collection methods which the trial judge characterized as ranging "from stupid to outrageous to criminal."

Before this suit was brought complaints had been made to the Consumer Protection Division which took the position, *inter alia,* that certain conduct of Action's routemen in dunning customers for payment and in repossessing rented property constituted violations of the CPA and of the Consumer Debt Collection Act, Title 14, Subtitle 2 of the Commercial Law Article. An assurance of discontinuance agreement between the Attorney General and Action was executed on February 28, 1978 pursuant to CL § 13-402 (b).

On February 4, 1980 the State instituted the instant case. Of the 64 violations for which the trial court imposed civil fines against one or more defendants, nearly all involved collection activity.[2] Restitution was ordered to be made to certain of Action's customers under CL § 13-406 (c) (2). It

---

2. One violation involved the misrepresentation of a used television as a new one. There were 14 instances in which Action was found to have violated the CPA by deceptive practices. Most, if not all, of these 14 incidents involved debt collection, *e.g.,* a routeman posing as a law enforcement officer. At least four of the 14 instances were "one-way switch-outs," a repossession tactic in which the routeman falsely represents that he is removing a TV which requires service in order to replace it with a functioning TV, but no replacement is furnished. There were 25 instances in which Action was found to have violated the Debt Collection Act and thereby the CPA. See CL § 13-301 (13) (iii). Twenty-four of those 25 violations arose after execution of the assurance of discontinuance. Under CL § 13-402 (c) (1) it is also a violation of the CPA "to fail to adhere to any provision contained in a written assurance of discontinuance . . . ." The chancellor treated the facts in the 24 incidents as violations of both the assurance of discontinuance and of the Debt Collection Act and imposed a $300 civil fine under CL § 13-410 (a) for two violations arising out of the same conduct in each of the 24 incidents. As there is no cross-appeal, we intimate no opinion on whether there has been an impermissible doubling up of fines.

was also the trial court's conclusion that the CPA was violated by the omission from Action's form rental agreement of the total amount of all of the periodic payments required to obtain title to the rented property. An injunction was issued as part of the final judgment directing Action to include this mathematical extension in the contract with each customer.

There are five contentions which the State makes:

1. Action's rental agreement, which credits rent toward purchase, is a transaction subject to RISA, does not comply with RISA, and thereby violates the CPA;

2. Action is required to disclose in advertising that a customer might receive a used appliance and to disclose in a written contract covering a used appliance that the appliance is used;

3. Civil fines should have been assessed for the violation of the CPA which the trial court held to have resulted from Action's failure to disclose the total of payments in its contracts;

4. Restitution should have been awarded to an additional two of Action's customers; and

5. Additional civil fines should have been imposed against Wolf, and civil fines should have been imposed against Kent.

Further facts will be stated as required in separately addressing particular contentions.

(1)

Underlying the State's contention that Action has violated RISA is the premise that violations of RISA's disclosure and redemption of security provisions also constitute violations of the CPA. Through this claimed nexus and the standing conferred by the CPA on the Consumer Protection Division, the State undertakes to assert in its name rights allegedly conferred on third persons by RISA. We assume this prem-

ise, *arguendo,* and turn to consideration of whether Action's type of transaction is governed by RISA. In this connection our review does not consider the intention of the parties in fact in any specific transaction. The trial of this case was concerned with the legal interpretation and effect under RISA of the rental agreement in light of Action's general practices. There is no contention by the State of trial court error in failing to find that RISA applied to a particular consumer's transaction with Action because of the facts peculiar to that transaction.

For Action's rental agreement to be governed by RISA, that contract must be an "installment sale agreement" as defined in CL § 12-601 (1), which reads:

> (1) "Installment sale agreement" means a contract for the retail sale of goods, negotiated or entered into in this State, under which:
>
> (i) Part or all of the price is payable in one or more payments after the making of the contract; and
>
> (ii) The seller takes collateral security or keeps a security interest in the goods sold.
>
> (2) "Installment sale agreement" includes:
>
> (i) A prospective installment sale agreement;
>
> (ii) A purchase money security agreement; and
>
> (iii) A contract for the bailment or leasing of goods under which the bailee or lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods.
>
> (3) "Installment sale agreement" does not include a bona fide C.O.D. transaction or a layaway agreement as defined in § 14-1101 (g) of this article.

The issue is whether an installment sale agreement is limited to a contract in which the buyer is obliged to pay one or more payments toward the price after the making of the contract or whether RISA's definition embraces a contract in

which additional payments toward price may be made by the buyer without any corresponding contract right in the seller to sue for the balance of the price.

RISA was enacted by Chapter 851 of the Acts of 1941 and resulted from a study by the Legislative Council. *See Retail Installment Selling,* Research Report No. 6 (Sept. 1940). That report described the nature of the installment sale which was of concern at the time as follows:

> Instalment selling now occupies so familiar a place in retail selling that the procedure followed in making an instalment sale, which is largely standardized, is well known. The purchaser of an article on the instalment plan usually makes a cash down payment (or "trade-in") of part of the purchase price, signs a credit instrument, usually a conditional contract of sale or sometimes a chattel mortgage, and also often signs a note for the balance due. This balance is payable in instalments, usually weekly or monthly, and for the privilege of paying the purchase price over an extended period of time the purchaser pays certain finance charges. Although the purchaser receives immediate possession of the goods sold, title remains in the seller until the entire purchase price is paid. The length of the contract, if the goods are not "soft", i.e., goods of a less durable type, such as clothing, is usually from one to three years. [*Id.* at 1.]

The State's position in the instant case rests entirely on a change made in 1975 during the code revision project in defining "security interest," a term which is found in CL § 12-601 (l) (1) (ii). To buttress its position, the State cites *United Rental Equipment Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 191 A.2d 570 (1963), the relevance of which will be discussed, *infra.* "Security interest" is now defined in CL § 12-601 (r) to have "the meaning stated in § 1-201 (37)" of the Commercial Law Article. This reference is to the U.C.C. definition which in relevant part reads:

> *"Security interest,"* means an interest in personal property or fixtures which secures payment or performance of an obligation. ... Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest." ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

We are not, however, in this case concerned with the scope of "security interest" as it might be applied under the U.C.C. Our task is confined to the interpretation of RISA. In the context of the latter statute, Action's no-obligation rental agreement is not, on its face, an "installment sale agreement." This conclusion flows from an examination of RISA as a whole and of the specific CL § 12-601 (1) definition.

RISA contemplates that the payments to be made by the buyer, which comprise the CL § 12-601 (1) (1) (i) element of an "installment sale agreement," are payments which the buyer is obliged to make. In CL § 12-606 RISA deals with the required disclosures in an installment sale agreement. These include the "principal balance owed" (CL § 12-606 (b) (8)) and the "time balance owed by the buyer to the seller" (CL § 12-606 (b) (10)). In Action's agreement, there is no balance "owed." CL § 12-606 (b) (7) requires disclosure of official fees charged for recording an "instrument securing or evidencing the buyer's obligation." Under CL § 12-606 (c) (2) the seller must give a 12 point bold type notice to the buyer of the buyer's right "[t]o pay off the full amount due in advance . . . ." Action's customers have no obligation to pay an amount due in the future. In providing that periodic

installments under an installment sale agreement may be payable monthly, semimonthly or weekly, § 12-611 (b) speaks of "[a]mounts due." Payments to the last known holder of an installment sale agreement made by a buyer who has no notice of an assignment "discharge [the buyer's] obligation to the extent of the payments." CL § 12-611 (d). In addressing add-on contracts CL § 12-618 (b) (2) (i) speaks of "[t]he amount due on the installment sale agreement immediately before the additional purchase." CL § 12-626 (e) deals with the sale of repossessed goods under certain circumstances. The proceeds of a sale which falls under that subsection are applied, after the payment of costs, to "[t]he unpaid balance owing under the agreement at the time the goods are repossessed." CL § 12-626 (e) (2) (iii). "If there is no resale of repossessed goods under § 12-626, all obligations of the buyer under the agreement shall be discharged . . . ." CL § 12-627. It is relatively clear from the tenor of RISA that the reference to "one or more payments" in the § 12-601 (l) (1) (i) element of the definition of "installment sale agreement" contemplates payments which the buyer is obligated to make.

The second element of "installment sale agreement" set forth in CL § 12-601 (l) (1) (ii) requires that the seller "takes collateral security or keeps a security interest in the goods sold." CL § 12-601 (e) (1) provides that " '[c]ollateral security' means any security interest in, encumbrance on, or pledge of property or goods that is given to secure performance of an obligation of a buyer . . . ." RISA's definition of "security interest," as it stood prior to the adoption of the Commercial Law Article, was "any property right in goods which are the subject of an installment sale agreement taken or retained to secure performance of any obligation of the buyer under the agreement . . . ." See Md. Code (1957, 1975 Repl. Vol.), Art. 83, § 152 (o). Thus, prior to the revision of RISA by Chapter 49 of the Acts of 1975, non-obligatory rental payments would not satisfy the second element of an "installment sale agreement." The change in the definition of "security interest" by the 1975

recodification was "added to conform the former definition of 'security interest' in Article 83, § 152 (o), to that of the Uniform Commercial Code, § 1-201 (37)." *See* Revisor's Note to Md. Code (1975), § 12-601 (r) of the Commercial Law Article. It is only because of that change that *United Rental, supra,* becomes relevant.

*United Rental* was a contest over the title to an air compressor between its lessor under an unrecorded lease and its purchaser at an execution sale held at the direction of a creditor of the lessee. Pennsylvania law applied and Pennsylvania had adopted the U.C.C. The lease called for $800 a month rental for a minimum period of one month and then provided:

> "After expiration of the minimum term herein set forth, the Lessee shall pay to the Lessor the same rental per month as hereinabove provided ***. Said rental shall start from the date of original shipment to the above designated site, and shall continue until the aforesaid equipment is returned to the lessor." [231 Md. at 559, 191 A.2d at 574.]

Eighty-five per cent of the $800 monthly rent was, by the lease terms, to be applied against the purchase price of $14,500. At that rate 21 monthly payments would have been required to effect purchase by the lessee. The lessor could terminate only for cause so that there was effectively an option to purchase in the lessee by continuing payment for 21 months. Because of the lessee's right to terminate after one month, the lessor argued that creation of a security interest under U.C.C. § 1-201 (37) was prevented. This Court held that "the parties contemplated the purchase of the compressor by [the lessee] if he continued to pay the specified monthly rental and otherwise complied with the lease." *Id.* at 559, 191 A.2d at 574. There was an unperfected security interest which did not take priority over the execution creditor of the lessee.

Even if we were to read *United Rental* most broadly as a holding that a provision for crediting nonobligatory rental

payments toward purchase demonstrates, for certain purposes under the U.C.C., an intention to create a security interest, that holding cannot be applied under RISA to Action's contract. To do so would render as surplusage that portion of the definition of "installment sale agreement" which specifically addresses leases. *See* CL § 12-601 (l) (2) (iii). Sub-subsection (2) of § 12-601 (l) lists three types of transactions which the term " '[i]nstallment sale agreement' includes." Each of the three inclusions operates to enlarge the basic definition in CL § 12-601 (l) (1) and is not set forth merely for purposes of illustration.

The first enlargement is a "prospective installment sale agreement." Under CL § 12-605 (b) (1), a buyer has an unconditional right to cancel an installment sale agreement until the buyer signs it and receives a copy of it signed by the seller. Under former Article 83, § 128 (c) (1) this cancellation provision referred to an installment sale "agreement or prospective agreement." In the 1975 recodification of RISA, reference in CL § 12-605 (b) (1), and apparently elsewhere, to a "prospective" installment sale agreement was dropped "to avoid unnecessary repetition" and, as a drafting technique, the "prospective" concept was placed in the inclusion portion of the definition of installment sale agreement. *See* Revisor's Note to Md. Code (1975), CL § 12-601 (l). This inclusion expands the CL § 12-601 (l) (1) definition.

A "purchase money security agreement" is now the second specific inclusion. *See* CL § 12-601 (l) (2) (ii). The legislative history of this provision is instructive. In former Article 83, § 152 (b) the predecessor provision was "any conditional sale contract [and] any purchase money chattel mortgage . . . ." [3]

---

**3.** Md. Code (1957, 1975 Repl. Vol.), Art. 83, § 152 (b) reads in its entirety:

(b) *"Installment sale agreement"* means any contract for the retail sale of goods, negotiated or entered into in this State, under which (1) part or all of the price is payable in one or more payments subsequent to the making of such contract, and (2) the seller has retained a security interest in the goods sold or has taken collateral security for the buyer's obligation; and shall include any condi-

Through recodification into the Commercial Law Article the provision was enlarged to read: "A conditional sale contract, purchase money chattel mortgage, or other purchase money security agreement . . . ." *See* Md. Code (1975), CL § 12-601 (l) (2) (ii). The Revisor's Note to that section advises that the definition was modified "[t]o avoid an otherwise, apparently unintended, gap." In other words, the installment sale agreement under RISA includes a purchase money security agreement and that concept is broader than a traditional conditional sale contract or purchase money chattel mortgage. By Chapter 33 of the Acts of 1980, CL § 12-601 (l) (2) (ii) was amended to delete the references to a conditional sale contract and to a purchase money chattel mortgage so as to leave standing only the reference to a "purchase money security agreement."

This 1980 amendment was part of the recodification which enacted the Financial Institutions Article. A Supplemental Revisor's Note to the amendments to CL § 12-601 effected by Chapter 33 of the Acts of 1980 states that § 12-601 was amended "without substantive change, to conform its definitions to the substantively identical definitions in Title 11, Subtitle 4 of [the Financial Institutions Article], which relates to the licensing of sales finance companies." *See* 1980 Md. Laws at 733. RISA's definition of installment sale agreement has its counterpart for sales finance companies in Md. Code (1980), § 11-401 (g) of the Financial Institutions Article. The Revisor's Note to that subsection in relevant part states:

> In paragraph (2) (ii) of this subsection, the former references to a "conditional sale contract" and a "purchase money chattel mortgage" have been deleted as unnecessary in light of the use of the term "purchase money security agreement." The definitions of "security agreement" and "purchase

---

tional sale contract, any purchase money chattel mortgage, and any contract for the bailment or leasing of goods under which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to or in excess of the value of the goods; but the term does not include a bona fide C.O.D. transaction.

money security interest" in the Uniform Commercial Code, CL §§ 9-105 and 9-107, make clear that the term "purchase money security agreement" includes the types of agreements covered by the obsolete terms "conditional sale contract" and "purchase money chattel mortgage."

This Revisor's Note also refers to the RISA definition of "installment sale agreement" as "substantively identical" to the definition of the same term in the sales finance companies subtitle of Title 11 of the Financial Institutions Article.

While CL § 12-601 (l) (2) (ii) enlarges the RISA definition of installment sale agreement beyond a conditional sale contract and purchase money chattel mortgage, it does so only to the extent of a "purchase money security agreement." Present CL § 9-105 (1), referred to in the Revisor's Note quoted above, states that " '[s]ecurity agreement' means an agreement which creates or provides for a security interest." Thus, a purchase money security agreement is an agreement creating or providing for a purchase money security interest. In the context of a transaction between two parties, as is involved in Action's rental agreement, CL § 9-107 provides that a "security interest is a 'purchase money security interest' to the extent that it is [t]aken or retained by the seller of the collateral to secure all or part of its price." Action's retention of title, as owner-lessor, does not secure a price to be paid by the lessee. The lessee is liable only for rent for those periods as of the beginning of which the lessee possesses the property. Repossession by Action as titleholder serves to eliminate future loss on the transaction, but it does not secure payment of a price for the sale of the goods rented.

Further, because an "installment sale agreement" is "substantively identical" under RISA and under § 11-401 (g) of the Financial Institutions Article, the State's effort to label Action's rental agreement an "installment sale agreement" faces another obstacle. Under Financial Institutions Article § 11-401 (k) " '[s]ales finance company' means a person who

is engaged, whether by purchase, discount, pledge, loan, or otherwise, in the business of acquiring, investing in, or lending money or credit on the security of any interest in[, *inter alia*, an] installment sale agreement made between other parties . . . ." The sales finance company deals, to the extent relevant here, in the paper generated between the RISA seller and buyer and not on the security of the physical inventory of the seller. But Action's paper evidences no obligation from buyer to seller to pay the balance of the price. Applying the State's concept of an "installment sale agreement" in the substantively identical sales finance company context produces a result that appears to be economically fanciful. This suggests that the State's interpretation was not legislatively intended.

The third inclusion in RISA's definition of installment sale agreement is a "contract for the bailment or leasing of goods under which the bailee or lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods." CL § 12-601 (1) (2) (iii). This provision similarly seems to be intended to expand the basic definition of "installment sale agreement." In the basic definition "[p]art or all of the price [for the retail sale of goods] is payable in one or more payments subsequent to the making of the contract." *See* CL § 12-601 (1) (1) (i). In a lease transaction payments are not, in form, paid toward price, but for use. Section 12-601 (1) (2) (iii) is the legislative test for determining cases in which substance will prevail over form for the purpose of subjecting the nominal lease to RISA. RISA applies if the "lessee contracts to pay" the value of the goods or more. If Action's lessees have not contracted to pay the total of payments needed to purchase the rented item, the provision in Action's leases for crediting rent toward purchase does not *per se* place the transaction under RISA. At this step in the analysis the parties clash again, and argue by analogy to the federal Truth-in-Lending Act.

That Act applies, *inter alia*, to a "credit sale," a term defined in 15 U.S.C. § 1602 (g), to include

any contract in the form of a bailment or lease if the bailee or lessee *contracts to pay as compensation* for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or another nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract. [Emphasis added.]

There is division of authority as to whether the type of lease represented by Action's agreement is a "credit sale" subject to the above-quoted statute. Cases holding that the lessee's right to terminate without liability for future payments prevents the agreement from being a "credit sale" are *Smith v. ABC Rental Systems of New Orleans, Inc.,* 618 F.2d 397 (5th Cir.), *aff'g,* 491 F. Supp. 127 (E.D. La. 1978); *Lemay v. Stroman's, Inc.,* 510 F. Supp. 921 (E.D. Ark. 1981); *Dodson v. Remco Enterprises,* 504 F. Supp. 540 (E.D. Va. 1980); *Stewart v. Remco Enterprises,* 487 F. Supp. 361 (D. Neb. 1980); *Dorsey v. Curtis Mathes,* No. 4-78 Civ. 436 (D. Minn., Mar. 23, 1979); *Clark v. Aquarius TV Rental, Inc.,* Civ. No. CA4-77-133 (N.D. Tex., Oct. 18, 1977); *Boyd v. ABC Rental Systems,* No. C-74-456-L(B) (W.D. Ky., Sept. 12, 1975); *Griggs v. Easy TV Rentals, Inc.,* No. C75-2509A (N.D. Ga., Apr. 22, 1976); *Terrell v. Mr. T's Rental,* No. C75-2053A (N.D. Ga., Apr. 29, 1975). Informal opinions of the staff of the Federal Reserve Board support this position as well. *See* FRB Letter No. 1192, Consumer Cred. Guide (CCH) ¶ 31,623 (June 15, 1977); FRB Letter No. 1010, *id.* at ¶ 31,350 (Feb. 25, 1976); FRB Letter No. 871, *id.* at ¶ 31,202 (Feb. 28, 1975); FRB Letter No. 783, *id.* at ¶ 31,105 (Apr. 18, 1974); FRB Letter No. 761, *id.* at ¶ 31,083 (Mar. 12, 1974); FRB Letter No. 750, *id.* at ¶ 31,069 (Jan. 11, 1974). The Federal Reserve Board has now adopted an interpretive regulation by amending Regulation Z to provide that a "credit sale" includes a bailment or lease "(unless terminable without penalty at any time by the consumer)." *See* 12 C.F.R. § 226.2 (a) (16) (1983).

Cases which have held that an agreement similar to that used by Action can constitute a "credit sale" under the Truth-in-Lending Act are *Clark v. Rent-It Corp.,* 685 F.2d 245 (8th Cir. 1982), *rev'g,* 511 F. Supp. 796 (S.D. Iowa 1981), *cert. denied sub nom., Rent-It Corp. v. Clark,* U.S. , 103 S. Ct. 1232, 75 L. Ed. 2d 466 (1983); *Burks v. Curtis Mathes Centers, Inc.,* Civ. No. 4-79-429 (D. Minn., Nov. 14, 1980); and *Waldron v. Best TV and Stereo Rentals, Inc.,* 485 F. Supp. 718 (D. Md. 1979). And *see Davis v. Colonial Securities Corp.,* 541 F. Supp. 302 (E.D. Pa. 1982) (month-to-month rental of house; rent credited against purchase; but lessee obligated for repairs, taxes, water and sewer rent, insurance and interest on unpaid balance). With the exception of *Davis* the other three cases relied upon by the State were decided on motion to dismiss or for summary judgment. They arose out of a specific transaction between a lessor and consumer and the consumer was the party plaintiff. The opinions reflect in part that proof of facts going to the question of intent in the transaction could affect the result on the merits.

We need not become embroiled in the question of the interpretation of the federal act and regulations because we are satisfied that when the Maryland General Assembly speaks of a lessee who "contracts to pay as compensation a sum" that is at least substantially equal to the value of the goods, the legislature means a lessee who makes an enforceable promise so to pay. The quoted language has remained unchanged since RISA was first enacted. *See* 1941 Md. Laws, ch. 851, § 134 (b). The ordinary meaning of words is usually their intended meaning, particularly where, as here, that meaning is consistent with the context.

CL § 12-601 (1) (2) (iii) deals specifically with the problem of which leases are to be treated as installment sale agreements. The current RISA definition of "security interest" incorporates the U.C.C. definition by reference. It is that definition incorporated by reference, and carrying with it the interpretation made by *United Rental* in another context, which injects an element of ambiguity into the scope

of RISA's reach over leases. As the statute more directly and specifically addressing the problem, CL § 12-601 (l) (2) (iii) should be given considerably greater weight in the interpretive process.

By the third paragraph of the CL § 12-601 (l) definition of "installment sale agreement" the bona fide C.O.D. transaction and "a layaway agreement as defined in [CL] § 14-1101 (g)" are excluded.[4] The legislative treatment of layaway transactions is consistent with Action's position because the General Assembly has in essence distinguished between obligatory and nonobligatory layaways in imposing statutory regulation on those transactions.

Layaways were expressly excluded from RISA when the Maryland Layaway Sales Act (CL §§ 14-1101 to 14-1110) was enacted by the Acts of 1978, ch. 673. Prior thereto the Consumer Protection Division had taken the position that § 12-615 of RISA applied to layaway agreements. This section confers rights to cancel and to a refund on a buyer who "is required under an installment sale agreement to make a payment to a seller before the seller is obligated to deliver the goods sold . . . ." CL § 12-615 (a) (1).[5] By a regulation

---

4. Subtitle 11 of Title 14 of the Commercial Law Article deals with layaway sales defined in CL § 14-1101 (g) as follows:

(g) *Layaway agreement.* — (1) "Layaway agreement" means a contract for the retail sale of consumer goods, negotiated or entered into in the State, under which:

(i) Part or all of the layaway price is payable in one or more payments subsequent to the making of the layaway agreement;

(ii) The consumer goods are specific existing consumer goods identified from the seller's stock or inventory at the time of the making of the layaway agreement; and

(iii) The seller retains possession of the consumer goods and bears the risk of their loss or damage until the layaway price is paid in full.

(2) "Layaway agreement" includes a "special order transaction," as defined in this section.

(3) "Layaway agreement" does not include a bona fide C.O.D. transaction.

(4) "Layaway agreement" does not include any form of layaway agreement where the buyer can default without any penalty, other than a maximum service charge of $1.

5. CL § 12-615 in full reads:

(a) *Buyer's right to cancel; refund.* — (1) If, in addition to any down payment, a buyer is required under an installment sale

proposed at 2:29 Md. R. 1743-44 (Dec. 24, 1975) and adopted at 3:13 Md. R. 720 (June 23, 1976), it became a CPA unfair trade practice for a layaway seller, who treated the buyer's failure to pay the selling price as a breach of contract, to claim damages in excess of 10% of the payments made. This is the limit set forth in CL § 12-615 (a) (2). *See* COMAR former § 02.01.04.04.F, repealed 5:16 Md. R. 1253 (Aug. 11, 1978). However, under the 1976 regulation, it was not an unfair practice for the layaway seller "to retain a nominal service charge if the customer is entitled to a refund of all amounts paid on the cash price of the merchandise held on lay-away," that is, if the customer had no obligation to complete the layaway. *See* COMAR former § 02.01.04.05. That difference in treatment between obligatory and nonobligatory layaway agreements is carried forward in the Maryland Layaway Sales Act. Under CL § 14-1106 (a) a layaway buyer defaults by failure "to make a required payment" within 15 days from the scheduled date, but CL § 14-1106 (c) limits the amount which the seller "may retain as liquidated damages." [6] On the other hand, the layaway

---

agreement to make a payment to a seller before the seller is obligated to deliver the goods sold, the buyer may cancel the installment sale agreement before delivery or tender of the goods by the seller.

(2) Notwithstanding any provision of the installment sale agreement, if it is cancelled pursuant to this subsection, the seller shall refund to the buyer within ten days after notice of the cancellation an amount equal to at least 90 percent of all payments made by the buyer under the installment sale agreement, including any down payment.

(b) *Buyer's refusal to accept delivery of goods.* — If, because of a down payment made under an installment sale agreement, the buyer is entitled to delivery of the goods before making any further payment and the buyer refuses to accept delivery of the goods in accordance with the installment sale agreement, all or part of his down payment may be forfeited to the extent provided in the installment sale agreement.

6. CL § 14-1106 (c) in full provides:

(c) *Liquidated damages upon default.* — If the buyer defaults under a layaway agreement 8 or more calendar days after the date of its execution, the seller may retain as liquidated damages an amount not to exceed 10 percent of the layaway price or the total amount paid by the buyer to the date of default, whichever is less.

buyer who "can default without any penalty," *i.e.,* who has in effect an option to terminate the agreement, commits no breach and is entitled to a full refund, except for a service charge limited to $1.00. *See* CL § 14-1101 (g) (4).

One difference between the no-obligation layaway and the no-obligation rental agreement is that upon termination of the latter the lessee receives no refund of amounts paid because the lessee has had the use of the goods and has contracted to pay rent for actual use, while the no-obligation layaway buyer receives, upon termination, a refund of payments made toward price because he made no legally enforceable promise to buy and the goods on layaway have at all times been in the possession of the seller. But the two transactions are similar in that the buyer or lessee may terminate without liability for future payments. In neither case has the General Assembly seen fit to put the transaction under an existing scheme of consumer sales regulation solely on the ground that one party might ultimately acquire title to goods.

The State also contends that a no-obligation lease is subject to RISA because of the following passage in *United Rental* (231 Md. at 559, 191 A.2d at 574):

> That the [lease] agreement would be regarded as a security instrument (conditional contract of sale), required to be recorded under Code (1957), Art. 21, Sec. 66, if Maryland law controlled, is indicated by *Beckwith Machinery Co. v. Matthews,* [190 Md. 182, 57 A.2d 796 (1948)] and *Alban Tractor Co. v. State Tax Commission,* 219 Md. 593[, 150 A.2d 456 (1959)].

We have shown above that for purposes of RISA's installment sale agreement, the "price [that] is payable in one or more payments after the making of the contract" (CL § 12-601 (l) (1) (i)) is a price which the buyer is obliged to pay and that if the contract takes the form of a bailment or lease, it is a RISA installment sale agreement only if "the

bailee or lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods." (CL § 12-601 (1) (2) (iii)). The reference in *United Rental* is to the former recording statute, Md. Code (1957), Art. 21, Title "Conveyancing," Subtitle "Conditional Contracts of Sale," § 66, the coverage of which is broader than RISA's definition of an installment sale agreement. That recording statute in relevant part provided:

> Every note, sale or contract for the sale of goods and chattels, or of any item of furnishing or equipment which is affixed to real property, wherein the title thereto, or a lien thereon, is reserved until the same be paid in whole or in part, *or* the transfer of title is made to depend upon *any* condition therein expressed and possession is to be delivered to the vendee, shall in respect to such reservation and condition, be void as to subsequent purchasers . . . and creditors . . . until such note, sale or contract be in writing, signed by the vendee and be recorded . . . . [Emphasis added.]

A condition that title will pass if the lessee, without having contracted so to do, pays at least the value of the goods, falls short of bringing a transaction within RISA.

The State further submits that it is untenable to rest decision of the RISA issue on the provision in Action's contract giving its customers the absolute right to terminate because, as a practical matter, termination without liability can always be achieved under CL §§ 12-626 and 12-627. The State's point rests on the interpretation of those sections made in 63 Op. Att'y Gen. 92 (1978). Under that interpretation, which we assume *arguendo,* the buyer of goods of the value of less than $2,000 who does not request a public sale of repossessed security, cannot be liable for a deficiency after resale. Action's leases involve total payments of less than $2,000. The issue is not, however, whether Action could enforce a claim for deficiency if its customers promised to pay all payments needed to acquire title. The issue is

whether Action's rental agreement is under RISA at all. The sections relied upon by the State reinforce our conclusion that RISA contemplates an agreement in which the buyer contracts to pay the price or in which the lessee contracts to pay at least the value of the goods. The deficiency referred to in CL § 12-626 (e) is the difference between the unpaid balance "owing" and the net resale proceeds.

The trial court was correct in holding that Action's contract, on its face, did not present a transaction regulated by RISA.

(2)

In its complaint the State had also alleged that Action had engaged in false advertising in violation of CL § 13-301 (1), (2) (iii), (3), (9) (i) and of CL § 13-303, all provisions of the CPA.[7] The State argues that because a lessee from Action may rent to purchase, it is highly material for the lessee to know whether appliances furnished by Action are new or used. Action's failure affirmatively to state in its advertisements that goods rented from it might be used goods is said to render the ads deceptive. Additionally the State charges that Action's contracts are deceptive and that they should specify whether the particular item delivered in a given transaction is new or used. If a used item is delivered, the contract should also disclose how long the item has been in Action's inventory and the number of other customers' homes in which it had been on hire. A mandatory injunction compelling Action to conform its advertising and contracts to these contentions was requested by the State, but was denied by the trial court. After a review of the evidence, including a presentation by the State of audiovisual tapes of

---

7. The State also alleged violations of CL § 11-703, a provision of the False Advertising subtitle of the Trade Regulation title of the Commercial Law Article. The trial court concluded that the CL § 11-703 claim was subsumed in the claims of violation of the CPA and made no separate analysis under CL § 11-703. On this appeal the State does not take issue with that approach. Therefore, substantive or procedural distinctions, if any, between the two statutes are not before us.

certain of Action's television commercials, the trial court concluded that the advertising was not deceptive.

The chancellor's opinion reflects that she applied the following legal standard in making her review:

> An advertisement is deceptive if it has the "tendency and capacity to mislead." . . . The advertisement is examined in its entirety to determine whether it creates a misleading impression . . . and a tendency to deceive only the most negligent, ignorant or credulous viewers renders an advertisement deceptive. . . . The [CPA] protects the negligent and careless person as well as the reasonable and prudent person . . . . [Citations omitted.]

Neither party has raised any legal question concerning the substance of this standard. In applying that standard to the facts of the case, the chancellor made the findings hereinafter set forth.

> After carefully considering the facts and the law, the court has concluded that Action's advertisements are not deceptive to even the most credulous. Viewing the advertisements as a whole and the factors cited by the State in particular, the impression created is that most of the sets are used. The word "rental" appears in the name of the company and throughout the advertisements. The fact that a rental purchase plan is available does not detract from the fact that the company is clearly engaged in the business of renting televisions. It is the nature of a rental business to re-rent units to various customers, and even the very naive members of the public know that a rental unit may be used. It would be ludicrous to assume that a rental company would obtain a new unit for each new customer, discarding all previously used sets. Of course, if a customer were interested from the outset in the rental purchase plan, it would be advantageous for him to request a new set, but

Action's advertisements do nothing to discourage that inquiry. If anything, the implication is that some sets may be used since they stress that the plan is a *rental* purchase plan.

An impression that all of the rental units are new is not created simply because the televisions shown in the advertisements are properly maintained. The success of a rental business lies in its service and in the quality of the merchandise it provides. The sets are not dilapidated when they are delivered to the customer and they need not be dilapidated when they appear in the commercials. As noted previously, the advertisements plainly state that Action is in the business of renting televisions and they create the overall impression that many of the televisions are used. [Emphasis in original. Footnote omitted.]

We hold that these findings are not clearly erroneous.

### (3)

The State's next assignment of error goes to the amount of civil fines imposed. It is contended that the trial court erred when, after concluding that certain omissions by Action constituted CPA violations, it did not determine the number of instances when that type of violation occurred and did not impose a civil fine for each such instance. Primary emphasis within the framework of this contention is placed on the circuit judge's conclusion that Action violated the CPA because its rental contracts did not state the total of payments needed to effect purchase.

In reaching this conclusion the trial court combined the standard which it had applied to the false advertising claim, described *supra*, with CL § 13-301 (1) which reads:

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other

representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers.

The trial court then found that

[b]y failing to disclose the total cash price of a unit under the rental purchase plan, the Action contract has the capacity to mislead some consumers. Since not all consumers are capable of performing calculations needed to ascertain the total amount payable under the plan, there is a possibility some will assume that the total cost is about the same as the amount charged for a credit sale.

An affirmative injunction was entered ordering Action to set forth this information in its contracts.

What the trial court should have additionally done, argues the State, was to infer from other evidence the number of times when this type of violation had occurred and then impose a fine for each inferred occurrence. The State points to an exhibit which had been introduced by Action for another purpose but which reflects that Action delivered 4,792 appliances in the period from January through September of 1979. From this the State submits that it would be "reasonable, and extremely conservative," to infer that Action entered into contracts with at least 5,000 consumers, that each contract constituted a separate violation and that a fine should be imposed for each. *Devine Seafood, Inc. v. Attorney General,* 37 Md. App. 439, 377 A.2d 1194 (1977), *cert. dismissed,* 282 Md. 482, 385 A.2d 85 (1978), is cited by the State in support of its position. In *Devine* there was evidence from former employees of a seafood retailer that the retailer had systematically charged consumers more than the posted prices. The trial court in that case concluded that, within the period of time covered by the testimony of the employees, there had been at least 100 violations and imposed a fine for each. However, the case at hand does not present a question of the scope of legitimate inference. Rather, because the trial court did not impose any fine based on the absence of a total

of payments from customer contracts, the question here is whether the trial court was compelled to impose fines.

This argument involves CL § 13-410 which reads:

> (a) *First violation.* — A merchant who engages in a violation of this title is subject to a fine of not more than $300 for each violation.

> (b) *Subsequent violation.* — A merchant who has been found to have engaged in a violation of this title and who subsequently repeats the same violation is subject to a fine in the amount of $500 for each violation.

> (c) *Fines as civil penalties.* — The fines provided for in subsections (a) and (b) of this section are civil penalties and are recoverable by the State in a civil action.

Refining its argument, the State asserts that subsection (a) makes the imposition of a fine mandatory upon the finding of a violation and that only the amount of the fine is discretionary, whereas subsection (b) is to be read as making both the imposition and the amount of the fine, *i.e.,* $500, mandatory. The State urges that the "trial court's order should be revised to reflect the number of proven violations and the trial court should then determine the civil penalty for each violation."

As we see it, the question is whether the words "subject to a fine," as used in CL § 13-410 (a) and (b), mandate the imposition of some amount of fine in all cases in which a CPA violation is found to have occurred. We hold that they do not. The quoted words also appear in sections of the CPA which establish criminal penalties and make the violator "subject to a fine." *See* CL §§ 13-308 (c) (dealing with electrical consumer products); 13-309 (b) (dealing with electrical extension cords); 13-313 (e) (dealing with fire resistant insulating material); and 13-411 (a) (the general criminal penalty section for the CPA under which a person convicted "is subject to a fine ... or imprisonment ...."). Upon the conviction of a person for a criminal violation of the CPA, a court has discretion not to impose any fine, or any imprisonment, if the latter is an allowable sentence under the partic-

ular statute on which prosecution is based. The court in a criminal case may "suspend the imposition . . . of sentence and place the defendant on probation upon such terms and conditions as the court deems proper." *See* Md. Code (1957, 1982 Repl. Vol.), Art. 27, § 641A (a). We find nothing in the CPA which reflects a legislative intent that the civil fines to which a violator "is subject" by CL § 13-410 must in all cases be imposed, when the criminal fines to which a presumably more culpable violator "is subject" under other sections of the CPA are not mandated.

In the case at bar the trial court did not find a violation and then leave the public without a remedy. That court issued an injunction. After having identified the omission from the contract of the total of payments as an unfair or deceptive trade practice, the trial court apparently concluded that the threat of contempt was an adequate deterrent. Reserving to the trial court a discretion not to impose any fine is particularly apt in light of the fact that under CL § 13-302 the State is not required to prove, in order to establish a CPA violation, that "any consumer in fact has been misled, deceived or damaged as a result of [a prohibited] practice." Even if we assume that the failure to impose a discretionary civil penalty could in a proper case constitute an abuse of discretion reversible on appeal, the nature of the violation here did not require the chancellor to impose penalties as a sanction for past conduct.

Also included by the State under its insufficient penalties argument is another type of CPA violation. This second aspect is based on the trial court's finding that Action had committed breaches of that portion of the assurance of discontinuance in which Action had promised to "make known through positive written statements to consumers at the time transactions are negotiated that the equipment being supplied may be used equipment." The injunction issued in this case requires this disclosure to be included in the contract, but civil fines were not imposed. Action had undertaken to establish a system of separate signature cards as the means for making this disclosure, but the circuit court found the system was, as to some unspecified customers, either not honored at all or only in a perfunctory manner.

The State does not specify in its brief any particular transaction where it contends a fine is required for this type of violation. Nor does it submit that there is a minimum number of occasions on which this type of violation occurred and which the trial court was compelled to find by inference from undisputed facts. For these reasons, and for the reasons given above concerning the total of payments disclosure, there was no reversible error in not laying civil fines for any CPA violations by way of breaches of the above-quoted portion of the assurance of discontinuance.

(4)

In an injunction action brought by the Attorney General under the CPA, the "court may enter any order of judgment necessary to . . . [r]estore to a person any money . . . acquired from him by means of any prohibited practice . . . ." *See* CL § 13-406 (c) (2). At final argument in this case the State argued for restitutionary relief and, responding to a request of the trial court, specified seven customer witnesses who, in the State's view, were entitled to a return of all rent paid to Action. Included in the seven were Sandra K. Lowery and Mary Edwards. In its decree the trial court ordered that restitution be made to the five other customers named by the State, but the decree neither grants nor denies a refund as to Lowery and Edwards. The opinion of the circuit judge makes certain fact findings concerning the separate transactions of Lowery and of Edwards with Action, but we are unable to discern from these findings whether or not the trial court was applying a distinction of some type between those to whom restitution was allowed and the two customers as to whom the order is silent on the subject of relief. For these reasons we shall, pursuant to Md. Rule 871 a, remand for further proceedings as to these two claims only.

(5)

The remaining issue raised by the State goes to the individual liability of Wolf and Kent. The trial court found that Wolf sanctioned use of the "one-way switch-out" and fined Wolf the maximum $300 for each of the four instances in

which the State proved that that deceptive practice was utilized. No fines were imposed on Kent. The State urges that both individuals should be fined for each of the debt collection violations which the trial court found to have occurred. In its brief the State marshals the evidence most favorable to its contention and says that "[i]ndividuals, like Wolf and Kent, who establish strict goals to be met by their employees, such as the 'close-rate,' cannot stick their heads in the sand when they see signs that their employees are utilizing illegal means to meet the company goals."

However, the trial court was quite clear in its finding on this aspect of the case. It said:

> [T]here is not sufficient credible evidence that either officer consented [to] or had prior knowledge of his employees' misdeeds. The two men made reasonable efforts to promptly and strictly discipline those who went against Action's policies.

The evidence and the inferences to be drawn therefrom were conflicting as to the knowledge and consent of Wolf and Kent and as to the nature and extent of disciplinary action taken. These issues are entirely factual and we cannot say that the trial court's findings were clearly erroneous.

> *Case remanded to the Circuit Court for Baltimore City for the limited purpose of reconsidering the claims asserted by the State of Maryland on behalf of Sandra K. Lowery and Mary Edwards under Md. Code (1975, 1983 Repl. Vol.), § 13-406 (c) (2) of the Commercial Law Article.*
>
> *In all other respects the judgment of the Circuit Court for Baltimore City is affirmed.*
>
> *Costs to be paid by the State of Maryland.*