550 A.2d 932

**Carmen A. KEELING**

v.

**FORD MOTOR CREDIT COMPANY.**

No. 151, Sept. Term, 1987.

Court of Appeals of Maryland.

Dec. 8, 1988.

Louise M. Carwell (Cheryl L. Hystad and Legal Aid Bureau, Inc., on brief), Baltimore, for appellant.

Robert J. Thieblot (Anthony W. Ryan, Robert D. Harwick, Jr. and Allen, Thieblot & Alexander, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

The principal question presented here is whether the lease of an automobile to the petitioner is governed by the

Retail Installment Sales Act (RISA), Md.Code (1975, 1983 Repl.Vol.), Title 12, Subtitle 6 of the Commercial Law Article.[1]

Petitioner, Carmen A. Keeling (Keeling), by a paper writing headed "Net (Closed End) Lease" and dated June 20, 1984, in terms leased from Champion Ford in Baltimore City a new 1984 Ford Escort two-door sedan equipped with radio and automatic transmission but without air conditioning or power steering.[2] The form lease contemplated immediate assignment to Ford Motor Credit Company (Ford Credit), the respondent, and it was so assigned. The lessees defaulted after making payments for the first two months. Ford Credit repossessed the vehicle in January 1985 by which time it had been driven approximately 10,700 miles. Ford Credit sold the car at auction and then sued Keeling in the District Court of Maryland in Baltimore City for the resulting deficiency. Keeling's principal defense was that RISA barred a deficiency judgment because Ford Credit failed to give required notices. The District Court concluded that the arrangement was a lease and not an installment sale governed by RISA. That court entered judgment for Ford Credit. In an appeal on the record the Circuit Court for Baltimore City affirmed, having similarly analyzed the transaction to be a " 'true' lease." We granted Keeling's petition for certiorari.

Under RISA a person (the "holder") who is entitled to enforce an "installment sale agreement" against a buyer may repossess goods sold under the agreement if the buyer is in default. Under § 12–624(d) the holder "[w]ithin five days after he repossesses the goods ... shall deliver to the buyer ... a written notice" concerning the buyer's right of redemption and to a resale, the buyer's liability for a deficiency and the location of the goods. If the installment

---

**1.** Unless otherwise noted all statutory references are to the above-cited Code and Article.

**2.** The lease was also signed by Joel E. Keeling who was sued but never served in this action.

sale agreement provides for liability for a deficiency and if the holder "has complied with all requirements of [RISA], including the notice requirement of § 12–624(d)," then the buyer may be liable for a deficiency. *See* § 12–626(e)(4). It was stipulated at trial that Ford Credit had not sent the § 12–624(d) notice. Thus, if the subject lease is an installment sale agreement, Keeling is not liable for any deficiency.

The statute to be construed in this case is § 12–601(*l*), which reads:

> "*Installment sale agreement.*—(1) 'Installment sale agreement' means a contract for the retail sale of goods, negotiated or entered into in this State, under which:
>
> (i) Part or all of the price is payable in one or more payments after the making of the contract; and
>
> (ii) The seller takes collateral security or keeps a security interest in the goods sold.
>
> (2) 'Installment sale agreement' includes:
>
> (i) A prospective installment sale agreement;
>
> (ii) A purchase money security agreement; and
>
> (iii) A contract for the bailment or leasing of goods under which the bailee or lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods.
>
> (3) 'Installment sale agreement' does not include a bona fide C.O.D. transaction or a layaway agreement as defined in § 14–1101(g) of this article."

In *State v. Action TV Rentals, Inc.*, 297 Md. 531, 467 A.2d 1000 (1983), we read § 12–601(*l*)(2), which "includes" three types of contracts within the definition of "installment sale agreement," to enlarge the basic definition of § 12–601(*l*)(1) and not merely to illustrate it. The basic definition requires that part or all of the "price" be payable in one or more installments but "[i]n a lease transaction payments are not, in form, paid toward price, but for use. Section 12–601(*l*)(2)(iii) is the legislative test for determining cases in which substance will prevail over form for the

purpose of subjecting the nominal lease to RISA." *Id.* at 548, 467 A.2d at 1009. In the leases involved in *Action TV Rentals* the lessees had not contracted to pay future installments. Those lessees paid cash in advance, usually for one week at a time, and could terminate without liability for any future payments. In the case now before us Keeling was obligated to make the lease payments for the term of the lease. Consequently, we must determine whether what is, in form, a lease to Keeling is, in substance, an installment sale agreement.

At trial in the District Court the only witness was a representative of Ford Credit who proved the lease and the deficiency as matters of business record. The lease is a printed form in which the specifics of this particular transaction were inserted by hand while the remaining provisions are "boilerplate." The lease was to run for forty-eight months from June 20, 1984, at a monthly rent, excluding rental tax, of $144.51 so that the total rent payments over the full term would have been $6,936.48. The lessee had to obtain comprehensive, collision and liability insurance and pay all operating, maintenance and repair costs excluding normal wear and tear.[3] The lessee paid all fees and taxes on the vehicle which was to be "titled in the name of Ford Credit" and "registered as directed by Ford Credit." There were no warranties under the lease, although "[t]he Lessee may receive a separate written warranty on the Vehicle." The lessee paid all taxes, other than income taxes, charged to the lessor by reason of the lessor's interest in the vehicle and the lessee was obliged to indemnify the lessor and Ford Credit "from all claims, losses and costs arising out of the

---

**3.** Repair obligations of the lessee included:
"(iii) repair or replace all dented, scratched, chipped, rusted or mismatched body panels, paint or vehicle identification items; all dented, scratched, rusted, pitted, broken or missing trim and grill work; all scratched, cracked, pitted or broken glass; all faulty window mechanisms; all broken or burned out lights; all electronic malfunctions; all interior rips, stains, burns or worn areas; and all damage which would be covered by collision or comprehensive insurance whether or not such insurance is actually in force."

use or condition of the Vehicle." Keeling paid a $175 "Refundable Security Deposit."

The lease provided for an excess mileage charge at the end of the lease of six cents per mile for each mile in excess of 60,000 or, on earlier termination, on a prorated basis. With respect to "Return of the Vehicle" the lease provided:

> "At the end of this Lease, the Lessee will return the Vehicle to the Lessor's address shown above or to such other place as Ford Credit may direct. If the Lessee keeps possession of the Vehicle past the end of the lease term, the Lessee shall continue to pay the monthly rental payments.... That payment shall not permit the Lessee to keep the Vehicle. The Lessee also shall pay to the Lessor any damage which the Lessor may have because the Lessee failed to return the Vehicle at lease end."

There is no option to purchase on the part of the lessee. Indeed, the document contains an express disclaimer that there is any purchase option.

If the lessee defaults, the lease provides that the lessor may repossess and sell at public or private sale, with or without notice to the lessee. On default the monthly payments for the balance of the lease term are accelerated. The lessor and lessee agree that "[t]he Lessor will subtract from the amount owed sums received from the sale of the Vehicle in excess of what the Lessor would have had invested in the Vehicle at the end of the lease term."

The printed form contains a separate section headed, "ASSIGNMENT," under which the lessor assigns to Ford Credit. In that section "Lessor agrees that the lease end residual value of the Vehicle is as follows[.]" In the lease to Keeling the amount inserted for residual value is $2,898.29. Beneath the assignment Keeling signed again to acknowledge that she had received a filled in copy of the lease and notice of the assignment to Ford Credit.

Keeling did not present any testimony before the District Court. In argument Keeling's counsel referred to a publication, which counsel called an "official used car guide,"

issued by the National Automobile Dealers Association. Counsel indicated that in "October of 1984, for a 1984 Escort, the manufacturer's sales and retail price—suggested retail price was $5,629.00." The court commented that 1984 Escorts come in different models, with two doors or four doors and with or without optional equipment and that the court did not know to which model counsel was referring or what equipment it had. The court further pointed out that Ford Credit was entitled to a return on its capital employed in the transaction.

## I

Keeling's RISA argument is premised on the retail sale market value of the Escort being $5,629 on June 20, 1984. Then, pointing to the total lease payments, excluding taxes, of $6,936.48, Keeling submits that under § 12–601($l$)(2)(iii) the lease is an installment sale agreement because she contracted "to pay as compensation a sum that is substantially equal to or is more than the value of the goods." The short answer to this contention is that the record does not reflect that the suggested retail selling price is in evidence or that the District Court found that the guide referred to by Keeling's counsel was probative of the retail sale market value of the particular car leased to Keeling. Nevertheless, because of the importance of the substantive issue, we shall assume, *arguendo*, that there is competent evidence in the record that the retail sale market value of the car leased to Keeling as of June 20, 1984, was $5,629.[4]

Ford Credit's principal answer to Keeling's RISA argument is based on the vehicle's having a lease end residual

---

**4.** We make this assumption for the purpose of testing the legal sufficiency of Keeling's position under facts most favorable to her, because we conclude that, even on that assumption, her position is legally insufficient. It would be improper for us to assume unproven facts most favorable to Keeling and on that basis to mandate entry of judgment in her favor.

value of $2,898.29.[5]   Ford Credit submits that the "value" of a leased vehicle, at the commencement of the lease, is the value of the lease plus the anticipated residual value of the vehicle.   Thus, Keeling cannot possibly have contracted "to pay as compensation a sum that is substantially equal to or is more than the value of the goods," because, no matter how the "compensation" paid under the lease is computed, it will fall short of the value of the vehicle by the residual value of approximately $2,900.

Ford Credit's residual value figure of $2,898.29 is set forth in the lease and assignment.   That document is in evidence.   Its admission was not limited to any particular purpose.   The document reflects that at least Champion Ford and Ford Credit agreed on a residual value of $2,898.29.   The agreement of those two parties is probative of residual value.   It is the only evidence of residual value in the case and if Ford Credit's argument is legally correct, the evidence is sufficient to support the judgment of the District Court on the RISA issue.

Residual value has been explained by the Consumer Council of Maryland (the Council), an advisory group to the Consumer Protection Division of the Attorney General's Office.   *See* § 13–202.   In its *Consumer Automobile Leasing Study* (1986), the Council cautions "that at the end of the lease the 'residual value,' or what the car will bring on the used car market, remains with the lessor."   *Id.* at 20. That study also points out that

> "[l]easing can produce 4 times the profit of a sale at term. This does not mean that a consumer is charged 4 times more for a lease, but the combination of the difference between the capitalized cost of the vehicle and the residual value, fees, and dealer overhead, taking into account interest during the life of the lease, over time generates

---

**5.** Ford Credit also argues that "compensation" contracted to be paid by the lessee must be reduced to present value in some fashion not specified in RISA.   In the view we take of the case it is unnecessary to decide that issue.

more profit. According to the industry, however, lessors assume more risk than sellers."

*Id.* at 1–2 (footnotes omitted). When comparing leasing versus buying the study makes the following observations:

"In leasing, according to the industry, a consumer pays for only the amount of time the car is actually used. With new cars, the lease generally coincides with the time during which most of the depreciation in the value of the car occurs, leaving a residual value, generally, based on *The Black Book*, or other current vehicle guidebooks. The lessor bases the monthly payments on depreciation, the difference between the purchase or capitalized costs and the estimated residual or market value at the end of the lease, plus fees and other profits. As stated earlier, the residual value of cars with the same purchase price may not be the same. A $25,000 Mercedes will not have the same residual value as a comparably priced Lincoln. Usage, such as excess wear and tear and high mileage, will also reduce value."

*Id.* at 28–29.

The issue in the case before us is the meaning of "value" in § 12–601(*l*)(2)(iii). " 'Value' is a word of many meanings." *Missouri ex rel. S.W. Bell Tel. Co. v. Public Service Comm'n*, 262 U.S. 276, 310, 43 S.Ct. 544, 554, 67 L.Ed. 981, 995 (1923) (Brandeis, J., with Holmes, J., concurring). Here, Keeling and the dissent take the position that "value" in § 12–601(*l*)(2)(iii) can be determined only by utilizing the retail market selling price. Under this approach, even though the goods are in fact leased, the lease is ignored. Ford Credit's approach to the value of the goods recognizes the fact of the lease in a manner not unlike the appraisal of a piece of real estate that is subject to a lease. One who purchases in fee simple real estate that is subject to a lease must evaluate the lease, which may or may not be an advantageous one, and also evaluate the remainder interest. Ford Credit submits that the vehicle's value in the instant case is the value of the lease and the value of whatever remaining useful life the vehicle reasonably is expected to

have at the expiration of the lease term, assuming the lessee has used and maintained the vehicle in accordance with the lease.

Ford Credit has the better of the argument. Under Ford Credit's approach it is immaterial whether the "compensation" paid by the lessee equals or exceeds the retail market selling price of the vehicle. The "compensation" is the economic equivalent of that part of the value of the vehicle over its lifetime which represents the term of the lease. So long as it is reasonable to anticipate at the time of the lease transaction that the vehicle will have some substantial value as a used car at the expiration of the lease, the § 12–601($l$)(2)(iii) "value" of the vehicle will exceed the "compensation" paid under the lease by the residual value.

Nothing in RISA requires that "value" in § 12–601($l$)(2)(iii) be given the limited meaning sought by Keeling and applied by the dissent. The subject section is exclusively directed at goods which are leased. Thus it is appropriate to value the goods as of the instant *after* they are leased and not as of some time before the lease. A common definition of the value of an item is the highest price at which a seller, willing but not compelled to sell, could sell it to a buyer who is willing but not compelled to buy. In the context of goods which are subject to a lease, that price would reflect the value (or detriment) to the buyer of the existing lease and it would reflect the anticipated retail market selling price, if any, of the used goods at the expiration of the lease.

Nor do we find any legislative history of RISA which contradicts the foregoing conclusion. RISA was enacted by Ch. 851 of the Acts. of 1941. The legislation resulted from Research Report No. 6 of the Maryland Legislative Council, *Retail Installment Selling* (1940). That study identified many abuses in installment selling but it did not address the use of leases at all. The likely model for present § 12–601($l$)(2)(iii) was a provision in the Uniform Conditional Sales Act (Uniform Act). It had been adopted by the National Conference of Commissioners on Uniform State

Laws in 1918. *See* The National Conference of Commissioners on Uniform State Laws, *Proceedings,* Twenty-eighth Annual Meeting, at 356 *et seq.* (1918). The Uniform Act was withdrawn from the active list of recommended statutes in 1943, pending the preparation of the Uniform Commercial Code. *See* Unif. Conditional Sales Act, 2 U.L.A. 1, 9 (1922, 1967 Supp.).

Section 1 of the Uniform Act included in its definition of a conditional sale

"any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, *and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract.*"

2 U.L.A. at 1–2 (italics added). The 1941 enactment of RISA picked up the first half of this definition but not the italicized portion. *See* Md.Code (1939, 1947 Supp.), Art. 83, § 139(b).

The Commissioners' Note to § 1 of the Uniform Act gives the following explanation of the lease provision:

"It is well known that some sellers attempt to evade the conditional sale recording acts by calling the contract a 'lease' or 'hiring agreement' and providing for the payment of 'rent.' Wherever these 'leases' are substantially equivalent to conditional sales, they should be subject to the same restrictions. This equivalency seems to exist when the buyer is bound to pay rent substantially equal to the value of the goods and has the option of becoming or is to become the owner of the goods after all the rent is paid. In such a contract 'rent' means the purchase price, and possession as 'lessee' means the possession of a buyer under an executory contract of sale. That the buyer, in some cases, has the option of becoming the owner and thus a sale is not sure to take place, is of but small importance, for, as a practical matter, the buyer will always be willing to accept owner-

ship when he has paid the value. The instances of a buyer declining to become the owner of goods where he has paid 'rent' equivalent to the value of the goods, and electing to return the goods and allow these payments to be considered as actual rent, must be exceedingly infrequent."

2 U.L.A. at 3.

In his Commentaries on the Uniform Conditional Sales Act, the reporter for that Act, Dean George G. Bogert of Cornell University College of Law, identified four types of contracts having the possible or probable purpose of passing title to goods at the end of a time set by a "lease": (1) the instrument provides for automatic transfer of title to the lessee; (2) the lessor agrees to execute a bill of sale; (3) the lessee has the option to become the owner, without further payment; and (4) the lessee has the option of becoming the owner upon payment of a nominal sum. 2A U.L.A. at 21–25 (1924).

The RISA definition of an installment sale agreement does not require that there be an agreement or option for the lessee to be or become owner. By not requiring that element the General Assembly made the RISA definition more flexible than the Uniform Act. Thus, the RISA definition eliminates any argument over the inclusion of "leases" accompanied by an oral, side agreement that the lessee can buy at lease expiration for a nominal consideration, and over the inclusion of "leases" by lessors who make no oral or written promises to sell but who, by practice, will sell at expiration for a nominal sum. Eliminating an option requirement also permits finding that "leases" of goods which are peculiarly susceptible to early functional obsolescence are installment sales if there will be little or no residual value at lease expiration and the lessor recovers the cost of the goods, overhead and profit in the form of rent. But a lease of goods which will have a substantial residual value at the expiration of the lease does not fit the traditional pattern of a disguised sale at which § 12–601($l$)(2)(iii) is aimed.

Moreover, the limited meaning of "value" for which Keeling contends is inconsistent with the contemporaneous practical construction of RISA and with the apparent administrative construction of that statute. Numerous legal questions arise as to how a businessperson would achieve compliance with RISA when a contract, which has been structured as a lease, is statutorily considered to be an installment sale. We shall limit the discussion, however, to certain disclosure aspects of RISA. In the discussion we assume an "advantageous" lease, a term which we shall use to mean a lease under which the consideration paid by the lessee equals or exceeds the retail market selling price of the goods and after which the goods are expected to retain a substantial residual value.

RISA regulates the form and content of an installment sale agreement. Such an agreement must include, *inter alia*, "[t]he cash price of the goods sold," "[t]he principal balance owed," and "[t]he finance charge stated as a sum in dollars[.]" § 12–606(b)(1), (8) and (9). On June 20, 1984, the date of the lease in the instant case, and of its assignment to Ford Credit, the finance charge on the installment sale of a new motor vehicle was not permitted to exceed twenty-four percent, computed as simple annual interest, on the outstanding balance. § 12–609(f)(1). Thus, under Keeling's interpretation, all advantageous leases are statutorily considered to be installment sales subject to RISA so that the lessor would be obliged to state part of the consideration paid for the lease as the "cash price of the goods sold." The lessor would also be obliged to state part of the consideration, not exceeding a rate of twenty-four percent per annum on the outstanding balance, as the amount of finance charge, and to state part of the consideration as the principal balance.

It is apparent from Ford Credit's printed lease form that Ford Credit has not been doing this. It is also apparent from the Council's 1986 *Consumer Automobile Leasing Study* that leasing is widespread in this State and that it is significantly more profitable than selling, based in part on

the residual value that reverts to the lessor or the lessor's assignee. Yet the Council's study gives no indication that the Consumer Protection Division considers advantageous leases to be governed by RISA.

Further, Ford Credit and other companies which engage "in the business of acquiring ... any interest in ... [a]n installment sale agreement made between other parties" are sales finance companies as defined in Md.Code (1980, 1986 Repl.Vol.), § 11–401(k) of the Financial Institutions Article (FI). Sales finance companies are required to be licensed by the Commissioner of Consumer Credit. FI § 11–403. The Commissioner, upon written complaint from a buyer, may investigate, pursuant to FI § 11–413(b), alleged violations of any provision of the subtitle relating to sales finance companies "or of any other law that regulates [installment sale] agreements[.]" After appropriate administrative proceedings, "the Commissioner may suspend or revoke the license of any licensee, if ... [t]he licensee knowingly or without exercising due care ... [v]iolates any provision of [the sales finance companies] subtitle or of any other law that regulates [installment sale] agreements." FI § 11–414(a)(1)(i). If Keeling's interpretation of § 12–601(*l*)(2)(iii) is correct, there have been wholesale violations of RISA by sales finance companies taking assignments of advantageous motor vehicle leases. Yet there is no indication that the Commissioner of Consumer Credit has administratively adopted and applied the interpretation contended for by Keeling.

The result of our interpretation of "value" is also consistent with contemporary consumer protection disclosure policy for consumer leases. By Ch. 577 of the Acts of 1987, the General Assembly enacted the Consumer Motor Vehicle Leasing Contracts Act, codified as §§ 14–2001 through 14–2007. Although this Maryland statute does not deal with the type of consumer motor vehicle lease presented here, *see, e.g.,* § 14–2001(c)(iii) (option to purchase is a prerequisite of statutory application), the disclosure provisions of the Maryland statute bear on the policy issue under consid-

eration. A lease regulated by the Act must contain "[a]ll disclosures required under Regulation M." § 14–2002(a)(2). Regulation M, 12 C.F.R., part 213, was adopted by the Federal Reserve Board pursuant to the Federal Truth–in–Lending Act, 15 U.S.C. § 1604 (1982). The regulation applies to consumer leasing and primarily defines a "consumer lease" to mean

> "a contract in the form of a bailment or lease for the use of personal property by a natural person primarily for personal, family or household purposes, for a period of time exceeding four months, for a total contractual obligation not exceeding $25,000, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease."

12 C.F.R. § 213.2(a)(6) (1988). Under Regulation M the consumer lease must disclose "[t]he number, amount, and due dates or periods of payments scheduled under the lease and the total amount of such periodic payments." 12 C.F.R. § 213.4(g)(3) (1988). Neither Regulation M nor the Maryland Consumer Motor Vehicle Leasing Contracts Act require the lessor to take the stream of lease payments and break out of it in some fashion a "cash price of the goods sold," "[t]he principal balance owed," and "[t]he finance charge stated as a sum in dollars." § 12–606(b)(1), (8) and (9). Under Keeling's argument, this would be required because the lease would be subject to RISA.[6] The Keeling interpretation would absolve her from the deficiency judgment at the price of confusion in disclosure to those who choose to obtain the use of an automobile through leases of the subject type.

On the record before us it appears that, in the economics of current society, the retail market selling price of an automobile does not function as a ceiling on the income which the automobile's owner can derive by first leasing the vehicle and then selling the used car after the lease has run

---

**6.** This analysis does not take into consideration possible federal preemption, on which we intimate no opinion.

its course. We decline Keeling's invitation to interpret the ambiguous term "value" in § 12–601(*l*)(2)(iii) in a strained and limited manner, inconsistent with the realities of the market place.

## II

■ Keeling next submits that the U.C.C. concept of a lease intended as security applies to § 12–601(*l*)(2)(iii) and that the subject lease is one intended as security for a sale. The concept finds partial expression in § 1–201(37), defining "security interest." The more relevant portions of the section read:

> "Unless a lease ... is intended as security, reservation of title thereunder is not a 'security interest'.... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The secured transactions title of the U.C.C. applies "[t]o any transaction (regardless of its form) which is intended to create a security interest in personal property," including a lease intended as security. § 9–102(1)(a) and (2). One commentator has aptly observed that "the majority of the problems arising under [§§] 1–201(37) and 9–102 involve leases, a fact which indicates that the Code's treatment of leases is not among its better accomplishments." Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of U.C.C. Section 1–201(37) and Article 9*, 1973 Duke L.J. 909, 919 (Coogan).

This Court's approach to the true lease versus conditional sale problem in the context of secured transactions under the U.C.C. was set forth in *Crest Inv. Trust, Inc. v. Atlantic Mobile Corp.*, 252 Md. 286, 250 A.2d 246 (1969). We listed a number of considerations and factors which deter-

mine whether a lease is a "true lease," but the factual emphasis was on residual value. *Crest* involved an office trailer which had been leased for a minimum of twelve months. Seventy-five percent of the rental was credited to purchase price under an option, but at the expiration of the lease, even with that credit, approximately fifty-five percent of the purchase price would have to have been paid for the lessee to become owner. We held it was not a lease intended as security. *Id.* at 292, 250 A.2d at 249. *Crest* found the pertinent law well summarized in *In re Alpha Creamery Co.,* 4 U.C.C. Rep.Serv. 794 (Bankr.W.D.Mich. 1967). That case concerned the lease of a typewriter accounting machine for a minimum of one year with a credit toward an option purchase of seventy percent of the rentals. Because thirty-two percent of the list price of the equipment would have to have been paid at the end of the lease for the lessee to become the owner, it was held to be a true lease. *Id.* at 798.

In *Crest* we distinguished *United Rental Equip. Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 191 A.2d 570 (1963). There a diesel-powered compressor had been leased for an indefinite term and eighty-five percent of the rentals could be applied against the purchase price under an express option. On that basis the lessee could become owner in twenty-one months.

We also find merit in a suggestion by Professor Coogan who has found that the analysis of the lease-security interest issue "in much of the tax literature is likely to be more penetrating than is that in most U.C.C. lease cases." Coogan, at 965. He describes a rule of thumb which has developed in the "super-cautious" opinions of lessors' tax counsel who are concerned not with winning the point if it is litigated "but rather [in being assured] that the issue is sufficiently clear that no litigation will be commenced." *Id.* at 967. Under that rule of thumb a lease is a "true" lease if it "must come to an end at a time when at least two years or twenty percent of the useful life of the leased item remains and ... this residual must be valued at not less

than fifteen percent of the purchase price." *Id.* We take judicial notice of the fact of contemporary life that there are motor vehicles in use six and more years after the model year. The lease here also satisfies the second element of the rule of thumb. The residual value of $2,898.29 is 51.48% of the assumed retail market selling price of $5,629.

With respect to the lease before us we agree with the courts below in concluding that it is not intended for security. The relatively stringent repair clause of the lease together with the surcharge for mileage exceeding an average of 15,000 miles per year reinforces the importance to the economic structure of the transaction of achieving the anticipated residual value when the car must be returned to Ford Credit at the end of the term. There is no provision for transfer of title to the lessee and there is no basis for concluding that the lessee was to become the owner at the expiration of the lease by some form of abandonment on the part of Ford Credit.

Keeling submits that the case at hand should be controlled by three decisions under Art. 9 of the U.C.C. involving auto leases, *In re Tillery,* 571 F.2d 1361 (5th Cir.1978), *In re Tulsa Port Warehouse Co.,* 4 Bank.R. 801 (N.D.Okla. 1980), *aff'd,* 690 F.2d 809 (10th Cir.1982) and *Columbus Motor Car Co. v. Textile–Tech, Inc.,* 68 Ohio Misc. 25, 428 N.E.2d 882 (1981). Each of these cases involved a type of motor vehicle lease in which the vehicle did not revert to the permanent possession of the lessor. Each involved leases under which the vehicle was to be sold at the expiration of the lease. If the sale produced less than the estimated residual value, the lessee paid the difference to the lessor, but if the estimated residual value was exceeded by the sales proceeds, the excess went to the lessee. Thus the lessee was viewed as having equitable ownership of the vehicle and the retained title of the lessor secured a purchase price. We need not indicate agreement or disagreement with the holdings of these cases. It is sufficient to

note that the leases there involved are distinguishable from that in the case at bar.[7]

■ Keeling's final argument is that the default provision under the subject lease casts this transaction as one for security. In part, the default clause of the lease provides that "[t]he Lessor will subtract from the amount owed sums received from the sale of the Vehicle in excess of what the Lessor would have had invested in the Vehicle at the end of the lease term."[8] This damage computation formula can be illustrated by the following hypothetical:

| | REMAINDER INTEREST | LEASE TERM |
|---|---|---|
| Balance of Lease Payments | | $4,000 |
| Sale Proceeds | $3,000 | |
| Lessor's investment at lease end | –2,000 | |
| Credit to lessee against accelerated payments | 1,000 | –1,000 |
| Damages payable by lessee | | $3,000 |

The formula computes expectation interest damages which reinforce the true lease nature of the transaction. The formula first applies the sales proceeds to reimburse for something described as "what the Lessor would have had invested in the Vehicle at the end of the lease term." Whether this is intended to be the precise residual value

---

7. In the parlance of the trade the distinction is between "a closed-end" leases, represented by the Ford Credit lease here, and "an open-end" lease, represented by the leases in the cases relied upon by Keeling. *See Consumer Automobile Leasing Study, supra,* at 21.

8. In its computation of the deficiency in this case Ford Credit did not follow its own default clause. Ford Credit charged Keeling with the total of delinquent payments, accelerated future rent payments, unpaid late charges, the cost of repossession and the cost of reconditioning the car for sale. Keeling was credited with the entire sales proceeds and the refund of the security deposit.

figure in the assignment portion of the lease, it is clearly designed to represent a residual value. The philosophy of the damage provision is that Ford Credit first gets back in cash from the proceeds of the sale a residual value of the vehicle. That value would have been received in the form of the used car had the lease run full term without default, repossession and sale. The balance of the sale proceeds are then credited to the unpaid rental installments and Ford Credit may, pursuant to the contract, obtain a judgment for any deficiency.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.

ELDRIDGE, J., dissents and files an opinion in which COLE and ADKINS, JJ., concur.

ELDRIDGE, Judge, dissenting:

The majority, concluding that the lease in this case is not governed by the Retail Installment Sales Act (RISA), Maryland Code (1975, 1983 Repl.Vol.), Title 12, Subtitle 6 of the Commercial Law Article, upholds the decisions below in favor of the Respondent Ford Motor Credit Company. Because I believe that the lease is clearly governed by the terms of RISA, I dissent.

I.

Ford Motor Credit Company claims that the lease was not subject to the notice requirements in § 12–624(d) of RISA because it was not an "installment sales agreement." § 12–601($l$)(2)(iii) of RISA defines an installment sales agreement as including:

"A contract for the bailment or leasing of goods under which the bailee or lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods."

The lessee contracted to pay as compensation $6,936.48, spread over 48 monthly installments. The trial court's ruling as to the retail sales value of the car at the time of

the contract is unclear, but the majority proceeds upon the assumption that the car had a retail value at that time of $5,629.00. Thus, the rental payments contracted for exceeded the retail sales value of the car by over $1,300.00. Yet, the majority rejects the conclusion that the sum of rental payments was "substantially equal to or ... more than the value" of the car.[1]

The majority's analysis is flawed by a basic misreading of the purpose of § 12–601(*l*)(2)(iii). The majority opinion states that "a lease of goods which will have a substantial residual value at the expiration of the lease does not fit the traditional pattern of a disguised sale at which § 12–601(*l*)(2)(iii) is aimed." But the language and legislative history of RISA make clear that RISA was not narrowly aimed at "disguised sales" but was instead intended to encompass any lease in which rental payments "substantially equal" the value of the goods leased.

The most fundamental principle of statutory construction has been reiterated by this Court many times, as for example, in *Taylor v. Dep't of Employment*, 308 Md. 468, 472–473, 520 A.2d 379, 381 (1987), where Judge Adkins stated for the Court:

"The threshold inquiry in any issue of statutory construction is whether the language is ambiguous or of uncertain meaning. If it is not, then the Court applies its plain and ordinary meaning. *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 517 A.2d 730 (1986); *Board of Educ. Mont. Co. v. Paynter*, 303 Md. 22, 491 A.2d 1186 (1985)."

Although in *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987), we pointed out that "the

---

**1.** The majority's short answer to petitioner's claim is that the record contains insufficient evidence of the retail market value of the vehicle at issue. This Court issued a writ of certiorari to answer the question of whether RISA protects consumers who enter lease agreements which obligate them to pay the substantial value of the goods leased. If the majority believes the record is insufficient to show what the value of the goods is, the proper disposition of this case is to either dismiss the writ of certiorari as improvidently granted or to remand for the taking of additional evidence. *See* Maryland Rule 8–604(d).

plain-meaning rule is not rigid," we also recognized that "[s]ometimes the [statutory] language in question will be so clearly consistent with apparent purpose (and not productive of any absurd result) that further research will be unnecessary." 309 Md. at 515, 525 A.2d at 633.

The language of § 12–601(*l*)(2)(iii) is non-technical, straightforward and unambiguous. It extends the coverage of RISA to any lease in which the "lessee contracts to pay as compensation a sum that is substantially equal to or is more than the value of the goods." This is the sole inquiry called for by the provision, and it in no way suggests that it is aimed at or limited to "disguised" sales.

The limited legislative history of § 12–601(*l*)(2)(iii) gives no support to the majority's cramped interpretation of the provision. While it is clear that much of RISA is aimed at abuses unique to actual sales, it is equally clear that the overriding purpose of RISA was the protection of unwary consumers from "oppressive business practices that were becoming more apparent with the rising quantity of consumer credit." *Associated Acceptance v. Bailey*, 226 Md. 550, 555, 174 A.2d 440, 443 (1961). Furthermore, as this Court stated in *State v. Action TV Rentals*, 297 Md. 531, 548, 467 A.2d 1000, 1009 (1983), § 12–601(*l*)(2)(iii) "seems to be intended to expand the basic definition of 'installment sale agreement.'"

As the majority points out, the language of § 12–601(*l*)(2)(iii) is borrowed from the Uniform Conditional Sales Act (UCSA). RISA adopts the first half of the UCSA definition of an installment sales agreement but omits the second half. The significance of this history in the present case, however, lies in the UCSA language which the General Assembly chose not to borrow. Had the Legislature intended to confine RISA's coverage to transactions which were actually sales, it would have adopted the remaining language of the UCSA requiring that the lessee be "bound to become or [have] the option of becoming the owner" (§ 1, Uniform Conditional Sales Act). Had it done so, the majority's view might be more persuasive. But the General

Assembly's deliberate omission of this limiting language makes it evident that the Legislature generally intended to encompass leases involving a particular level of rental payments regardless of whether the transactions were in any sense sales. The majority's reading of the statute not only imposes limits which are not there, but imposes limits which the General Assembly considered but chose not to include.

The majority, faced with the critical difference in language between RISA and the UCSA, attempts to minimize its significance. The majority acknowledges that "the General Assembly made the RISA definition more flexible than the Uniform Act." Then, however, the majority suggests, without citing any source, that the more "flexible" RISA extends coverage to only a very few leases not covered under the UCSA.[2] While certainly RISA covers the leases enumerated by the majority, there is nothing to support the view that the increased flexibility of RISA was designed to cover only these few, specific instances. Had the Legislature meant to limit RISA in this fashion, it could have done so explicitly.

The consumer protection rationale of RISA suggests that the broad language of § 12–601(*l*)(2)(iii) was designed to afford lessees who had incurred substantial liability the same minimal protections afforded purchasers under the Act. RISA's consumer protection measures are as important to lessees as they are to consumers who buy on installment plans. Like buyers, lessees of consumer goods may be liable for the entire sum contracted for, even if the

---

2. The majority opinion describes these leases as follows:
   "Thus the RISA definition eliminates any argument over the inclusion of 'leases' accompanied by an oral, side agreement that the lessee can buy at lease expiration for a nominal consideration, and over the inclusion of 'leases' by lessors who make no oral or written promises to sell but who, by practice, will sell at expiration for a nominal sum. Eliminating an option requirement also permits finding that 'leases' of goods which are peculiarly susceptible to early functional obsolescence are installment sales if there will be little or no residual value at lease expiration and the lessor recovers the cost of the goods, overhead and profit in the form of rent."

goods leased are repossessed for non-payment. It only makes sense that, since a lessee's liability may be no different from that of a buyer, the authors of RISA intended that the lessee's protection be as great.

Finally, the question of whether or not a lease is intended for security is irrelevant to whether the lease is covered by § 12–601($l$)(2)(iii). The existence of a security agreement is part of the definition of an "installment sales agreement" in § 12–601($l$)(1) and is not a limitation on the leases covered by § 12–601($l$)(2)(iii). As this Court stated in *State v. Action TV Rentals, supra,* 297 Md. at 545, 467 A.2d at 1007, § 12–601($l$)(2) "operates to enlarge the basic definition of CL § 12–601($l$)(1) and is not set forth merely for purposes of illustration." Thus, the majority's discussion of whether the lease in this case was intended for security, and the fact that the lessee had no option to purchase, are not particularly germane to whether this lease is included under § 12–601($l$)(2)(iii).

## II.

Having begun with the faulty premise that § 12–601($l$)(2)(iii) is aimed only at leases that are "disguised" sales, the majority opinion strays further and further from the plain meaning of § 601($l$)(2)(iii)'s language.

The majority opinion accepts the respondent's argument that the term "value," as used in § 12–601($l$)(2)(iii), means "the value of the lease plus the anticipated residual value" of the leased item. Thus, in the majority's view, the petitioner

> "cannot possibly have contracted 'to pay as compensation a sum that is substantially equal to or is more than the value of the goods' because no matter how the 'compensation' paid under the lease is computed, it will fall short of the value of the vehicle by the residual value of approximately $2,900."

As the majority notes, the word "value" has many meanings. Nevertheless, the meaning which the majority gives

to "value" in § 12–601($l$)(2)(iii) ignores the plain language and purpose of the provision, and ultimately renders the provision ineffectual.

The majority's view is that, irrespective of the amount of rental payments, as long as a leased item has substantial residual value at the end of the lease, RISA does not apply. This disregard for the amount of rental payments ignores the language of § 12–601($l$)(2)(iii) which calls for a comparison of the rental payments to the value of the good. The majority opinion shifts the inquiry solely to the value of the goods at the end of the lease. Thus, even if the petitioner had contracted to pay a million dollars over the course of the lease, she would not be protected by RISA because the car had some substantial value at the end of the lease.

The majority's reliance on residual value also ignores that part of § 12–601($l$)(2)(iii) which says that contracted-for rental payments "substantially equal to or ... *more than* the value of the goods" (emphasis added) bring a lease within the scope of RISA. Under the majority's definition of "value," such payments could never, even theoretically, exceed the value of the goods. At best, if the goods had no residual value, the payments could equal the value of the goods. Yet, § 12–601($l$)(2)(iii) clearly envisions a definition of value in which rental payments could be more than the value of the goods.

In addition, the residual value approach completely subverts the usefulness of § 12–601($l$)(2)(iii). Virtually every consumer item, including automobiles, will have some residual value at the end of a lease, even if only as scrap. Many types of consumer goods will almost always have a substantial residual value. Thus, the number of the leases to which § 12–601($l$)(2)(iii) applies will be negligible. The majority recognizes this but contends that the provision is aimed only at those very few items that would have no residual value at all, such as "goods which are peculiarly susceptible to early functional obsolescence." However, there is no evidence to suggest that § 12–601($l$)(2)(iii) was designed to have such a narrow focus. Furthermore, lessors of the few

items that are still covered by § 12–601(*l*)(2)(iii) under the majority's approach might be able to circumvent the protections offered by RISA simply by asserting that the leased items will have substantial residual value at the end of the lease. The mere assertion that the automobile at issue in this case would have a residual value of $2,900 has been enough for the majority to conclude that the lease is not covered by RISA. While a lessee could offer evidence to show that an item would have little or no residual value at the end of the lease, such a showing is much more difficult than showing that the payments contracted for equal or exceed the retail selling price. By declaring § 12–601(*l*)(2)(iii) applicable to only a narrow range of leases, and by permitting easy circumvention of the provision in even those few instances, the majority renders § 12–601(*l*)(2)(iii) virtually useless.

The majority states that nothing in RISA requires that "value" be given the meaning sought by the petitioner. Obviously, RISA is not explicit in indicating what meaning to give "value." However, the broad consumer protection purpose of RISA, and the use of the words "substantially equivalent" in § 12–601(*l*)(2)(iii), indicate that the General Assembly envisioned a simple, common sense test for determining whether a given lease was covered by RISA. An approach where the "ignorant and unwary"[3] consumer could determine at a glance (based on the market price of the goods and the payments under the lease) whether RISA applies is more consistent with the language and purpose of the statute than an approach requiring the calculation of the residual value of an item several years in the future. I believe that a common sense view of this lease would be that payments totaling $6,936.48 are substantially equal to the value of a car originally worth $5,629.00.

The majority contends that automobile lessors have not been complying with the disclosure requirements of RISA,

---

**3.** *Associated Acceptance v. Bailey,* 226 Md. 550, 555, 174 A.2d 440, 443 (1961).

and that to make them do so now would result in "confusion in disclosure to those who choose to obtain the use of an automobile through leases of the subject type." This desire to spare consumers confusion is admirable but misdirected. First of all, it is not clear how many leases would be affected if petitioners' view was adopted. It is not self-evident that most, or even many, leases involve rental payments substantially equal to the value of the goods leased. Secondly, there is little merit to the majority's suggestion that confusion would result if lessors, in compliance with RISA, had "to take the stream of lease payments and break out of it in some fashion a 'cash price of the goods sold,' '[t]he principal balance owed,' and '[t]he finance charge stated as a sum in dollars.'" The majority acknowledges that some leases are, indeed, covered by RISA (*e.g.*, those involving goods subject to early functional obsolescence). If the lessors of these items can conform their leases to the requirements of RISA, it is unclear why other lessors would be unable to do so. In any case, whatever the efficacious effects on the leasing industry of the majority's position, it is not the role of this Court to promote business efficiency at the cost of rendering useless an enactment of the General Assembly.

Furthermore, the majority states that in its *Consumer Automobile Leasing Study*, the Consumer Council "gives no indication that the Consumer Protection Division considers advantageous leases to be governed by RISA." On the contrary, the study contains language suggesting that the Council does view such leases as governed by RISA. The study, citing § 12–601(*l*) of the Commercial Law Article, the subsection at issue in this case, states (p. 27) (emphasis added):

"In Maryland, some laws already address leasing.... Certain credit transactions, including *leases in which the payments equal, substantially equal, or exceed the original purchase price, are under the jurisdiction of the Commissioner of Consumer Credit,* while the Maryland

Retail Installment Sales Act covers all retail installments sales."

While this statement initially seems to suggest that leases are not at all related to the installment sales covered by RISA, a closer examination of the language reveals that the study's statement strongly supports the view of the petitioner in this case. The study points out that leases in which payments equal or exceed the original purchase price are under the jurisdiction of the Commissioner of Consumer Credit. The jurisdiction of the Commissioner of Consumer Credit, as stated in § 12–631(a) of the Commercial Law Article, extends to complaints "for violation of any provision of Part II of this subtitle." Part II of subtitle 6 contains the disclosure requirements of RISA. Furthermore, the study's language—"leases in which the payments equal, or exceed the original purchase price"—closely tracks the language of § 12–601($l$)(2)(iii). Thus, not only does the study say that leases like those described in § 12–601($l$)(2)(iii) are subject to RISA, but, in referring to payments which "substantially equal ... the original purchase price," accepts the definition of "value" urged by the petitioner and rejected by the majority.

Finally, even if the majority's definition of "value" is correct and the value of the automobile is "the value of the lease plus the residual value" of the automobile at the end of the lease, the payments contracted for by the petitioner are still "substantially equal" to the value of the automobile. Even using the respondent's figure of $2,900 as the residual value of the car, the rental payments were more than ⅔ of the value of the car.

### III.

Analogous cases in Maryland and elsewhere support the view that the payments contracted for in this case substantially equal the value of the car. Two Maryland cases, neither involving RISA, but both dealing with whether a purported lease was in fact a conditional sale, are illustrative. In *Beckwith Machinery Co. v. Matthews*, 190 Md.

182, 57 A.2d 796 (1948), this Court held that a lease of mining machinery was actually a conditional sale where the total of the rental payments over the course of the eight month lease were 56% of the purchase price, a percentage "so great as to virtually compel the lessee to buy." 190 Md. at 192, 57 A.2d at 800. In reaching that decision, the Court approvingly cited *Williston On Sales* (2nd ed.) § 336, p. 780: "... courts have disregarded the form of the transaction and have held that where payment of so-called rent nearly or quite pays the price of the goods the bargain is [a] conditional sale."

The *Beckwith* court also cited *In Re Rainey*, 31 F.2d 197 (D.Md.1929), in which the court held that rental payments over the course of a three month lease which amounted to 60% of the entire value of the goods rendered the lease a conditional sale. Although both *Beckwith* and *Rainey* involved leases with short terms and options to purchase, they resemble the present case in that a purported lease involving payments totaling a significant percentage of the purchase price was deemed a sale.

Cases in other jurisdictions reach similar results. In *United States Leasing Corp. v. Franklin Plaza Apts. Inc.*, 319 N.Y.S.2d 531, 65 Misc.2d 1082 (1971), lease payments totaling $4,740 over a term of 60 months for equipment with a "total list" of $3,426 were "substantially 'equivalent to or in excess' of the value of the equipment." 319 N.Y.S.2d at 533, 65 Misc.2d at 1084. In *Thomas v. Wright*, 21 Cal.App.3d 921, 98 Cal.Rptr. 874 (1971), the court held that lease payments of $3,856.32 for a vehicle with a cash value at the time of the contract of $2,325.80 were substantially equal to the car's value. Finally, in *Traylor Bros., Inc. v. Indiana Equipment Co.*, 336 S.W.2d 590 (Ky.1960), the court held that a lease agreement, under which the rental payments and a trade-in equaled all of the purchase price except for ten months of interest, was in fact a conditional sale.

Obviously none of these cases is dispositive of what the Maryland General Assembly intended in RISA. None-

theless, the consumer protection purpose of RISA, the language of the statute, and the Legislature's omission of the requirement that the lessee have an option to purchase, suggest that the statute's protection should be at least as broad as the protections afforded by the courts in the above cases. The majority's conclusion that the petitioner is not protected by RISA runs counter to the letter and spirit of that act. The burden which RISA imposes on respondent and on lessors in general is not onerous. It merely requires that they give notice within five days of repossession so that unwary consumers can take action to protect their rights.

Judges COLE and ADKINS have authorized me to state that they concur with the views expressed herein.