587 A.2d 1190

**STATE of Maryland**

v.

**COTTMAN TRANSMISSIONS SYSTEMS, INC.**

**No. 943, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

April 4, 1991.

716

William D. Gruhn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., William Leibovici and Lucy A. Weisz, Asst. Attys. Gen., on the brief), Baltimore, Md., for appellant.

Stephen Horn (Robert L. Zisk and Schmeltzer, Aptaker & Shepard, P.C., on the brief), Washington, D.C., for appellee.

Argued before MOYLAN, BLOOM and CATHELL, JJ.

CATHELL, Judge.

Cottman Transmission Services, Inc. ("Cottman"), a Pennsylvania corporation, is a franchisor of numerous automotive transmission repair facilities throughout the United States. In 1988, the Attorney General's Office of the State of Maryland ("State") filed a four count complaint against Cottman in the Circuit Court for Baltimore City. Counts 1

through 3, citing the Maryland Consumer Protection Act ("CPA"), Md.Com.Law Code Ann. § 13–101 *et seq.*,[1] alleged that Cottman engaged in trade practices which were unfair and deceptive under § 13–301(1), (3), (7) and (9). In Count 1, the State asserted that Cottman was selling unnecessary transmission inspections to its customers by misleading them into believing that the inspections were required by Cottman to form an estimate of the repair costs. Count 2 alleged that Cottman induced customers to authorize and pay for unnecessary repairs. Count 3 stated that Cottman had charged customers for fictitious repairs. Count 4 alleged that Cottman had violated the Automotive Repair Facilities Act ("ARFA"), Md.Com.Law Code Ann. § 14–1002, and § 13–301(13)(vi)[2] of the CPA by failing to provide written estimates of parts and labor costs.

The State filed a Motion for an Interlocutory Injunction pursuant to Md.Com.Law Code Ann. § 14–406(a), seeking to halt the alleged unfair and deceptive trade practices. At a conference prior to a hearing on the injunction, the trial judge ordered that the case files be sealed. He also closed the courtroom to the public and prevented the State from communicating with the press about the case. After a denial of a Motion to Reconsider the closure order, the State appealed. This Court reversed the closure and limited the order,[3] so as to proscribe only those comments which were

---

1. The CPA originated in 1967. *See* 1967 Md.Laws ch. 388.

2. The provision cited in the complaint concerns residential real estate. We presume that the State in fact meant § 13–301(14)(vi), which specifically mentions the ARFA.

3. The order was not technically a "gag" order. It was a "restrictive" order. A gag order prohibits the press from performing its functions. A restrictive order directs those under the jurisdiction of the court not to communicate. A gag order is almost always a prior restraint; a restrictive order need not be. *See Evans v. State,* 304 Md. 487, 511–12, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986) (restrictive order entered by trial judge which curtailed the dissemination of statements by the parties, witnesses, attorneys, jurors and police).

relative to the merits of the case. *State v. Cottman Transmission Systems,* 75 Md.App. 647, 542 A.2d 859 (1988) (*"Cottman I"*).

The hearing on the State's Motion for Interlocutory Injunction was then held, and the motion was denied. The trial judge granted an oral motion by Cottman for summary judgment on the issue of agency, ruling that no principal/agent relationship existed between Cottman and its Maryland centers with respect to the recommendation and sale of unnecessary repairs by its franchisees.

The State appealed. *State v. Cottman Transmission Systems,* [No. 1430, 1988 Term, per curiam, filed April 26, 1989] (citations omitted) (*"Cottman II"*). In our discussion of the motion for interlocutory injunctive relief, we necessarily dealt with the *likelihood* of success on the merits, and held that the State had *at that stage* failed to prove that Cottman's Maryland shops were agents of the Pennsylvania corporation. Thus, we affirmed the trial court's refusal to issue the requested interlocutory injunction.

After subsequent hearings, the trial judge granted a summary judgment motion by the State regarding Cottman's[4] withholding of diagnostic and price information from consumers, ruled that Cottman's participation constituted a deceptive practice, and enjoined its continuance. In the instant appeal, we shall decide the validity of that summary judgment.

The entry of summary judgment ultimately resulted in the entry of final judgment for the State as to Count 1, and

---

**4.** The judge found, by a preponderance of the evidence, that Cottman was indirectly involved in the transmission repairs and thus was a merchant. Cottman has not appealed that ruling. Section 13–101(g) defines a merchant as one "who directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit." *See Devine Seafood v. Attorney General,* 37 Md.App. 439, 377 A.2d 1194 (1977), *cert. dismissed as improvidently granted,* 282 Md. 482, 385 A.2d 85 (1978).

final judgment for Cottman as to Counts 2, 3, and 4.[5] Cottman's franchisees were not parties, and were held not to be its agents, so they were not ordered to do anything. A $100,000 civil penalty was imposed on Cottman, and a permanent injunction was issued requiring it to "issue new policy directives to its franchises ... directing ... them to no longer withhold from consumers material price and diagnostic information immediately after performance of any road test and external transmission inspection and before the consumer commits to paying for an internal transmission inspection...." The judge denied the State's motion for restitution to the consumers involved.

The State presents these questions on this appeal:

I. Is restitution under the Consumer Protection Act only available to consumers who received no goods or services after being deceived?

II. Did the lower court err in failing to order the disclosure of material price information, the omission of which would tend to deceive consumers?

III. Did the lower court err in determining on summary judgment that Cottman is not responsible for its centers' sale of unnecessary transmission repairs, despite evidence that Cottman's centers are required to follow all directives Cottman issues concerning both overall policies and day-to-day operations, that Cottman hires and fires center personnel, that Cottman encourages the sale of unnecessary repairs, and that Cottman requires the use of procedures that result in the sale of unnecessary repairs? [6]

In its conclusion, the State clarifies its requested relief: [T]he lower court's denial of restitution [should] be reversed and remanded for any necessary proceedings to

---

5. The briefs of the parties indicate that all issues before us were resolved on motions for summary judgment, which were entered as final judgments.

6. Because of the labyrinthic nature of this case, our resolution of the issues cannot be best discussed using the organizational arrangements

provide consumers with the restitution contemplated by the Consumer Protection Act, that the lower court's refusal to order Cottman to disclose the maximum price [of transmission repairs] be reversed and remanded for entry of an order requiring such a disclosure, and that the Order ... granting judgment to Cottman on Counts II, III, and IV be reversed and that the case be remanded for a jury trial on those counts.

Cottman filed a cross appeal, asking:

1. Whether the circuit court erred in interpreting the general Consumer Protection Act to add a requirement to the more specific Automotive Repair Facilities Act.

2. Whether the court impermissibly amended the Automotive Repair Facilities Act.

3. Whether the court erred in holding that the "RCI" method is a deceptive practice under the Consumer Protection Act.

4. Whether the court erred in failing to assess the alternatives before finding that the RCI method was deceptive.

5. Whether the court erred in failing to require the State to proceed by rulemaking.

6. Whether the court erred by imposing penalties vicariously on Cottman for the acts of its non-agent licensees.[7]

This multiplicity of questions may be reduced to three issues:

---

of the parties' briefs. We therefore will use our own outline. To aid in understanding our rulings in respect to appellant's issues, we note that our discussion of the first issue begins in the portion of our opinion entitled "Count I E.—Restitution"; for the second issue, see "Count I A.—Deceptive Practices" and "B.—Scope of the Injunction"; and for the third issue, see our discussion in "Count I D.—The Agency Relationship"; "Count 2"; "Count 3" and "Count 4."

7. As an aid to referencing our opinion to Cottman's issues, we note that we address its first and second issues in "Count 4" of our opinion; its third and fourth issues in "Count I A.—Deceptive Business Practices"; its fifth issue in that portion of our opinion titled "Adjudication vs. Rulemaking"; and its sixth issue in "Count I C.—Civil Penalty."

1) the propriety of the trial judge's grant of summary judgment on each of the four counts;

2) whether the trial judge erred in interpreting the CPA and ARFA to allow

a) the imposition of civil penalties, and

b) issuance of a permanent injunction requiring Cottman to direct its franchisees to provide consumers with price and diagnostic information;

3) whether the trial judge erred in refusing to grant restitution to consumers under Count 1.

We shall address these three issues as is necessary within our discussion of summary judgment with respect to the individual counts, and discuss the other issues as we deem necessary.

### The Summary Judgment Standard

In *Lone v. Montgomery Co.*, 85 Md.App. 477, 503–04, 584 A.2d 142 (1991), this Court discussed the appellate standard of review of summary judgment:

Maryland Rule 2–501(e) provides that:

The court shall enter judgment in favor of or against the moving party if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

In reviewing a grant of summary judgment, we must first determine whether a dispute of material fact exists. *Arnold Developer, Inc. v. Collins*, 318 Md. 259, 262 [567 A.2d 949] (1990). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *Id.* at 261 [567 A.2d 949] (quoting *King v. Bankerd*, 303 Md. 98, 111 [492 A.2d 608] (1985)). Where the facts are susceptible to more than one permissible inference, the choice between inferences should be made by the trier of fact, and should not be resolved on a motion for summary judgment. *Honaker v. W.C. & A.N. Miller Dev. Co.*, 285 Md. 216 [401 A.2d 1013] (1979), *aff'd*, 291 Md. 241 [434

A.2d 564] (1981); *Miller v. Nissen Corp.*, 83 Md.App. 448, 458 [575 A.2d 758] (1990); *Barb v. Wallace,* 45 Md.App. 271 [412 A.2d 1314] (1980). When a determination is made as to whether a factual dispute exists, all inferences must be resolved against the moving party, even if the underlying facts are disputed. *Berkey v. Delia,* 287 Md. 302 [413 A.2d 170] (1980); *Maloney v. Carling Nat'l Breweries, Inc.,* 52 Md.App. 556 [451 A.2d 343] (1982).

## COUNT 1

The judge made certain rulings with respect to this count. We list them as we shall hereafter address them. He (A) entered summary judgment for the State concerning the issue of Cottman's deceptive business practices, finding Cottman in violation of the CPA for its policy of requiring its franchisees to conceal material information from consumers; (B) granted an injunction; and (C) assessed a civil penalty; (D) ruled that, as a matter of law, there was no agency relationship between Cottman and its franchisees; and (E) denied the State's request for restitution to consumers.

### A.

### Deceptive Business Practices

The CPA defines a deceptive trade practice in this context as either a "[f]ailure to state a material fact if the failure deceives or tends to deceive," Md.Com.Law Code Ann. § 13–301(3) (1990); or "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with," § 13–301(9); or as a violation of the ARFA, § 13–301(14)(vi). An omission is considered material if a significant number of unsophisticated consumers of the goods or services would attach importance to the information in deciding on a course of action. *Golt v. Phillips,* 308 Md. 1, 10, 517 A.2d 328 (1986). *See also Charles of the Ritz Distributors*

*Corp. v. Federal Trade Comm'n,* 143 F.2d 676, 679–80 (2d Cir.1944). We think that a material fact, in the context of the case at bar, is one which a reasonable consumer of transmission repairs would consider important when deciding whether to give a mechanic permission to work on his car.

The trial judge granted partial summary judgment for the State on Count I. He ruled, *inter alia,* that:

2. Cottman withholds diagnostic and price information from consumers before the consumers commit to an internal transmission inspection (the "RCI", remove, check and install); [8]

3. this diagnostic and price information is material to consumers;

4. the practice of withholding this diagnostic [the type of repairs needed] and price [the cost of the repairs] information is a deceptive practice as that term is defined under Sections 13–301(3) and (9) of the [CPA] and violates Section 13–303 of the [CPA]....

According to the trial court, Cottman's directive to its franchisees, requiring them to withhold diagnostic information, when that information was known and thus was a material fact, was a deceptive practice by Cottman, independent of whether there was an agency relationship.[9]

---

8. "Remove, check and install": remove the transmission from the car, check it for problems, and reinstall it back on the car.

Cottman alleges, on its cross-appeal, that the judge erred in finding that this method was a deceptive practice under the CPA, and that he failed to assess the alternatives before so finding. Cottman misreads the record. The judge stated, "... I have no criticism of the R.C.I.....
I find that to be in complete conformity with Maryland law." He thus agreed with Cottman that the R.C.I. itself was not a deceptive practice, but that it was the withholding of information as to its necessity that was deceptive.

9. As discussed *supra,* Cottman was found to be a "merchant." In order to accept Cottman's theory, we would have to hold that a merchant company may insulate itself from the consequences of its deceptive practices by conducting them through intermediaries. We reject that theory.

We agree that the diagnostic information is important, because a reasonable consumer would attach importance to learning that an overhaul is needed, prior to committing to an internal inspection which is marketed as necessary to determine that very fact. Omission of this information is a deceptive business practice, because when a transmission repairperson externally inspects a vehicle's transmission a diagnosis always occurs.

The court asked Cottman's vice-president, James Corkran: Do you know for certain whether or not once you go through the 21 point inspection and it's test driven and the external examination has been done ... whether or not it, at a minimum, it requires a soft part overhaul?

THE WITNESS: Yes.

THE COURT: You would know that with what I would say is a 99 percent certainty?

THE WITNESS: Yes.

THE COURT: And the customer is not advised of that, correct?

THE WITNESS: Yes[.]

THE COURT: The customer is advised that for 200 dollars an RCI can be conducted and the exact price then can be quoted. Is that correct?

THE WITNESS: Yes, it is[.]

We have not located any evidence in the thousands of pages of the record extract which contradicts this testimony. We hold, therefore, that there is no dispute of fact regarding Cottman's concealment of diagnostic information.

The price information is likewise important, as even Cottman concedes: "The problem with overhaul and maximum prices is that consumers attach the *wrong importance* to that information." (Emphasis in original.) The consequences of consumer acquisition of price information may not be to Cottman's liking, but that information is unquestionably a material fact. There is no dispute that the minimum and maximum price for an overhaul of any particular transmission may be readily determined. The mini-

mum price stems from the cost of the time and materials which always must be expended on any overhaul for that brand (called a "soft parts" overhaul by the parties). The maximum price is the cost of a completely rebuilt or exchanged transmission. The parties also do not dispute the difficulty of determining the exact cost in an intermediate situation, where it is evident from the external inspection that the transmission requires at least a "soft parts" overhaul, and possibly more.

■ Failure to mention the possible total price, when that price is known to the merchant, *under the circumstances of this case, is a deceptive practice.* We hold that when a franchisor directs deceptive practices by using its economic and contractual clout to force its franchisees to commit deception, to the extent here exhibited, the franchisor equally commits a deceptive practice.

## B.

### Scope of the Injunction

The injunction defined price and diagnostic information as "material to the consumer" and directed that it be disclosed, but did not specify whether it was referring to minimum or maximum prices. Prior to the injunction's issuance, the judge explained:

> I did not make a finding that minimum prices had to be quoted. I didn't make that finding and I definitely didn't make a finding about maximum prices. The finding or the order regarding minimum prices is only an affirmative injunctive act.

> The minimum pricing was only the affirmative act trying to come to some terms with a way to dispose of this case.

Given this somewhat ambiguous statement concerning the judge's intended definition of price, we will interpret it and hold that price information must be given *consistent with the diagnosis.*

The *Golt* definition of materiality forces the conclusion that the projected cost of repair is of vital concern to the

consumer *if the repair is a possibility.* For example, if an external inspection results in a diagnosis that a transmission requires a "soft parts" overhaul and *possibly* a new torque converter, the customer must be told exactly that. The customer must also be informed of the minimum cost which has so far been ascertained; in this example, the cost of a "soft parts" overhaul plus the *possible* extra cost of replacing the torque converter. Thus, the customer must be given two categories of price information: (1) the cost of repair that is certain to be needed, and (2) the possible cost of repair that is likely to be required. The customer may then make an informed choice as to whether to proceed.

## C.

### The Civil Penalty

■ Cottman contests the assessment of civil penalties against it on the ground that it should not be penalized for the actions of third parties over which it had no control. In support, it points to our conclusion in *Cottman II* regarding Cottman's total lack of control. We disagree. The CPA provides that for a first violation, a "merchant who engages in a violation of this title is subject to a [civil] fine of not more than $1,000 for each violation." Section 13–410(a). Cottman, not its franchisees, was found to have violated the CPA, and is thus properly subject to penalties.[10]

---

**10.** Pursuant to the finding of violation, a civil penalty of $100,000 was entered against Cottman, payable in four yearly installments. According to the plain language of the statute, at least 100 violations would have to have been committed by Cottman to result in a fine of this amount. When calculating the penalty, the trial judge stated:

After having listened to the discussions of both attorneys', I have come to the conclusion that we have more than ample reason to justify a numerical penalty.... The problem is to work out an adequate penalty. In light of the broad discretion of the stature [sic], I am going to impose a penalty up to one hundred thousand dollars ($100,000.00) categorically, with a fashion I feel is an adequate fine in this matter.

No findings were ever made regarding the dates of, or number of times the CPA was violated. *See State v. Action TV Rentals,* 297 Md. 531, 561, 467 A.2d 1000 (1983) (where the State did not specify in its

We have heretofore specifically upheld the trial court's ruling on the basis that Cottman itself participated in the deceptive practices. Section 13–101(g) defines a merchant as one "who directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit."

[T]he cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intention. The language of the statute itself is the primary source of this intent; and the words used are to be given "their ordinary and popularly understood meaning, absent a manifest contrary legislative intention." *In re Arnold M.,* 298 Md. [515], 520, 471 A.2d 313 [ (1984) ]. Stated another way, where the language of the statute is free from ambiguity, courts may not disregard the natural import of the words used in order to extend or limit its meaning.

*Privette v. State,* 320 Md. 738, 744–45, 580 A.2d 188 (1990) (citations omitted). *See also D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177 (1990); *Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761 (1990); *Brodsky v. Brodsky,* 319 Md. 92, 98, 570 A.2d 1235 (1990); *Morris v. Prince George's Co.,* 319 Md. 597, 603, 573 A.2d 1346 (1990); *Davis v. State,* 319 Md. 56, 60, 570 A.2d 855 (1990); *Kaczorowski v. City of*

---

brief any particular transaction or number of occasions where the violation occurred, the appellate court will not find reversible error in the trial court's failure to lay fines). This Court in the past has seemed to hold that the defendant must have the opportunity to cross-examine each witness. *Klein v. State,* 52 Md.App. 640, 646, 452 A.2d 173 (1982), cert. denied, 295 Md. 440 (1983) (there must be sufficient sworn testimony to support each violation); *Smith v. Attorney General,* 46 Md.App. 78, 88–89, 415 A.2d 651 (1980) (evidence as to 80 out of 100 consumer complaints concerning violations of the CPA was insufficient, as the complaints were not supported by sworn testimony); *Devine Seafood v. Attorney Gen.,* 37 Md.App. 439, 444, 377 A.2d 1194 (1977), cert. dismissed as improvidently granted, 282 Md. 482, 385 A.2d 85 (1978) (the appropriate standard of proof is a preponderance of the evidence). General restitution orders were, however, approved by the Court of Appeals in *Consumer Protection Division v. Consumer Publishing Co.,* 304 Md. 731, 501 A.2d 48 (1985). *See also State v. Andrews,* 73 Md.App. 80, 533 A.2d 282 (1987).

This issue of the method of computation of the penalty was not raised on appeal; therefore, we decline to address it further.

*Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). The Legislature, by its inclusion of the word "indirectly" in its description of the acts which make one a merchant, strongly indicates that a merchant is not only one who has face to face dealings with consumers, but also one who substantially participates in the process, as Cottman did.

We also note that the evidence introduced subsequent to our filing of *Cottman II* belies Cottman's assertion of lack of control. For example, one of the deponents testified that the operations managers visited the repair shops periodically, and that

> Their job is to police the operation, to police the shop, to make sure the managers are following the sales tracks [memorized sales pitches], to make sure the managers aren't giving out prices over the phone, to make sure they are writing up the repair orders, to make sure they are using the forms, check your files, check your cabinets.

There was also testimony to the effect that the operations managers pressured the repair facilities to inflate their estimates so that minor preventive repairs would become major overhauls:

> [Y]ou should never have more PMS's [preventive maintenance services] than you have major jobs. They also pull out the repair orders and look at what's written on them and if it's burnt fluid [discolored transmission fluid], or leaks, or whatever, they feel like those jobs should be major jobs and they tell you that the manager is not converting enough of those jobs into major jobs.

Cottman did not merely exercise control over peripheral matters such as cleanliness or business hours; its control extended to every facet of the individual repair shop's *dealings with its customers* as well as its internal business practices. The operations managers' review of the records of each repair and their instructions regarding future repairs are inconsistent with Cottman's averments of total lack of control. For example, the establishment of sales pitches which were to be followed word for word, and quotas for the major and minor categories of transmission

repairs determine that the repair shop personnel had little discretion in their dealings with the individual customer. The result was a significant level of control over the day-to-day performance of the work, the manner in which it was to be done, *and the way the deception was to be practiced upon the public.* As we have indicated, this deception need not be grounded in an agency relationship in order to be prohibited.[11]

 It necessarily follows, and we so hold, that a franchisor who indirectly or directly offers goods, services, realty or credit may be a merchant as defined in the Act. The purposes stated in the Act support this holding.[12] As a merchant acting indirectly, it may be held liable for its deceptive practices. When its deceptive practices result in violations, the correct penalty determination would be based on the franchisees' furtherance of the franchisor's deceptive practice with respect to individual consumers. Thus, each contact by the franchisees that perpetuates the franchisor's

---

11. See our discussion, *infra*, of agency. We distinguish agency from that degree of control necessary to establish "indirect" participation under the CPA.

12. 1967 Md.Laws Ch. 388 states that:
 WHEREAS, there has been mounting concern over the increased incidences of deceptive practices in connection with the sale of goods and services in the State of Maryland; and
 WHEREAS, certain merchants unfairly take advantage of an unsuspecting public and thereby reap an undeserved profit; and
 WHEREAS, such practices undermine the public confidence in those supplying consumer goods and services, while actually a majority of these businessmen operate with integrity and sincere regard for their customers; and
 WHEREAS, the people of Maryland should be protected from the practices of a small minority of unscrupulous individuals and to rid the State of the individuals would work to the advantage of the honest businessmen of the State by raising public confidence in the business community....
 The CPA contemplates the elimination of the "practices." If it was intended to apply only to merchants who had contact with consumers, it would not have included "indirect" purveyors of offers, etc. The statute was designed to punish those who, like Cottman, committed, *or caused,* the practices.

deception is a prohibited act, for which either merchant may be held accountable.

As we have indicated, the manner in which the fine was computed has not been attacked on appeal. We therefore affirm the trial court's imposition of civil penalties against appellant for *its* deceptive practices.

## D.

### The Agency Relationship

Another summary judgment issue we shall discuss in connection with Count 1 concerns the issue of agency. The State reasons that by virtue of Cottman's right of control, it is either a master and its franchisees servants, or that it is a principal and its franchisees agents. It argues that Cottman is, therefore, liable for the misrepresentations made by its service centers as either a master or a principal under the doctrine of *respondeat superior*.[13] Thus, we must determine the legal standards of (1) the principal/agent relationship, and (2) the master/servant relationship, to arrive at a definition of what a material fact is in this context.

In *Sanders v. Rowan*, 61 Md.App. 40, 484 A.2d 1023 (1984), this Court stated:

---

13. As we have stated, the existence of an agency relationship is not essential to Cottman's liability, given the purposes of the CPA and its applicability to indirect acts. Thus, while the existence of an agency relationship may determine many legal issues between the parties, and between them and third parties, the existence of an agency relationship is not essential to the maintenance of a CPA action, when the person sought to be charged is committing acts designed to further prohibited deceptive practices. We perceive that the State presses this agency issue in order to be able to assert CPA actions against franchisors for acts committed by franchisees completely independent of any coercion or actions of the franchisor. Even if the facts of this case were to be different, we would be reluctant to recognize that vast a judicial expansion of the scope of the CPA's provisions. Though the foreign cases we mention, *infra*, appear to indicate otherwise, it could be argued that a franchise relationship is somewhat inconsistent with an agency relationship.

> [T]he principal/agent relationship is a generic one—a genus, of which the master/servant relationship is a species. Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not servants. Agents who are not servants are regarded as independent contractors.

*Id* at 50, 484 A.2d 1023. By definition, therefore, both independent contractors and servants are agents.[14] In the present case, we are asked by the State to make a determination as to the repair centers' status, both as agents and as servants. While we have determined that Cottman is liable independent of agency considerations, we nevertheless address this issue in order that it may be resolved. We must first determine whether there was a dispute of material fact as to agency; if there is, its resolution would be a matter for the trier of fact.

> There are three elements that are integral to an agency relationship: (1) The agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal. *Restatement (Second) of Agency* §§ 12–14 (1958). In noting that the control element is instrumental in proving the existence of an agency relationship, the *Restatement* explains that "[i]t is the element of continuous subjection to the will of the principal which distinguishes the ... agency agreement from other agreements." *Restatement (Second) of Agency* § 1(1) comment b (1957)....

*Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985). When an agency relationship is

---

**14.** The relationship between an attorney and client or broker and client is an example of the principal/independent contractor variety. *Brady v. Ralph Parsons Co.*, 308 Md. 486, 510 n. 27, 520 A.2d 717 (1987). One important consequence of the distinction between independent contractors and servants is that the doctrine of *respondeat superior* normally does not apply to the principal/independent contractor relationship. *Id.* at 511, 520 A.2d 717.

sought to be inferred from the parties' conduct, the party alleging the agency has the burden of proving its existence, nature and extent. *Proctor v. Holden,* 75 Md.App. 1, 20–21, 540 A.2d 133, *cert. denied,* 313 Md. 506, 545 A.2d 1343 (1988).

■ The State argues that "the determination of whether an agency relation exists ... is to be determined by evaluating *five* (not three) criteria...." (Emphasis in original.) It then lists the right to hire, fire, payment of wages, the right to control, and whether the work is performed as part of the regular business of the principal, as the required factors. As we have seen, this assertion is incorrect. The first determination of agency is made using the three *Schear* factors. The five factors urged upon us by the State are indicative of a *master-servant* relationship, and are only considered after a preliminary determination of agency has *already been made.* Only then is the inquiry focused on the possible existence of a master/servant relationship:

> One may be an agent of another, owing to his principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered a servant. *The relationship of master and servant* exists only when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.

In *Keitz v. National Paving Co.,* 214 Md. 479, 491, 134 A.2d 296 (1957), this Court said:

> [T]here are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia,* ex-

cepting (4), seems controlling in the determination as to whether such relationship exists. . . .

*Chevron, U.S.A. v. Lesch*, 319 Md. 25, 32–33, 570 A.2d 840 (1990) (emphasis added, citations omitted).[15] We note first that in *Cottman, II,* we were concerned with whether the trial judge was wrong in not finding the existence of an agency relationship. In the present appeal, we are concerned with whether any trier of fact could have found the existence of an agency relationship. We are also concerned with whether there was a dispute of a material fact, and if not, whether the moving party was entitled to judgment as a matter of law. We shall, therefore, next apply the three *Schear* factors to the evidence.

The licensing agreement between Cottman and its franchisees stated:

The relationship between COTTMAN and OPERATOR is strictly that of a licensor and licensee and OPERATOR is an independent contractor. This Agreement does not create a joint venture, partnership, or agency and any act or omission of either party shall not bind or obligate the other except as expressly set forth in this Agreement.

■ This contractual disavowal of an agency relationship is borne out by the record. The evidence shows that Cottman received 20½% of its franchisee's gross sales, with the franchisees retaining 79½%. In the record we have reviewed, we have not found any sufficient evidence that

---

**15.** This case involved a gas station customer who was injured due to alleged negligence in the repairing of his car by a mechanic. The customer sued the mechanic, his gas station employer, a "jobber," and Chevron. The claim against the jobber was based on an agency theory—that the gas station and its employees were servants of the jobber. A lease agreement between the station and the jobber was introduced to establish that the gas station was subject to the jobber's actual control. The Court held that the jobber's exercise of control over the gas station and its servants flowed partly from its status as a jobber, and partly from its status as a landlord. Lease provisions governing the operation of a gas station in the areas of business hours, cleanliness, lighting, and the number of junked cars allowed on the premises did not, in the Court's view, establish the degree of control required for the existence of a master/servant relationship.

the franchisees had a duty to act primarily for Cottman's benefit. While there may have been sufficient evidence, as to the other two factors, to generate a jury issue, there was none with respect to the second agency factor.[16] We hold, therefore, that there is no dispute of material fact regarding the absence of the principal/agent relationship between Cottman and its franchisees. The trial judge was correct in rendering summary judgment on this issue.

### E.

### Restitution

The State also made a request, under Count 1, for restitution to the consumers involved in Cottman's deceptions. The stipulated summary of the hearing reveals that the judge granted Cottman's Motion to Dismiss on the restitution issue, apparently ruling that as the consumers received an internal transmission inspection for their money, the deception did not harm them.

Section 13–406 (c) provides, *inter alia:*

The court may enter any order of judgment necessary to:

(1) Prevent the use by a person of any prohibited practice;

---

**16.** The existence of an agency relationship is not necessarily incompatible with a franchise. *See, e.g., Drexel v. Union Prescription Centers,* 582 F.2d 781, 786 (3d Cir.1978) (the mere existence of a franchise agreement does not trigger, nor insulate, the parties from a master-servant relationship. The determination of agency is made by examining the nature and extent of control as defined in the franchise agreement, or by the parties' actual practice); *Wood v. Holiday Inns,* 508 F.2d 167 (5th Cir.1975) (jury could find that a franchisor may be liable for acts of franchisee if there is a principal-agent relationship between them); *Taylor v. Checkrite, LTD,* 627 F.Supp. 415, 416 (S.D. Ohio 1986) (the existence of a franchisor-franchisee relationship does not preclude the existence of a principal-agent relationship); *Singleton v. International Dairy Queen,* 332 A.2d 160 (Del.Super.Ct.1975) (franchisor may be found to be a principal where the franchise agreement exerts sufficient control); Annot., *Vicarious Liability of Private Franchisors.* 81 A.L.R.3d 764 (1977); 16 Business Organizations, *Glickman, Franchising* § 4.04[1] (1990); 62B Am.Jur.2d, *Private Franchise Contracts* § 406 (1990).

(2) Restore to a person any money or real or personal property acquired from him by means of any prohibited practice. . . .

The proper standard here is not whether the customers received an inspection for their money; it is whether the merchant induced the consumers to pay for the inspections through deception. *See Golt*, 308 Md. at 13–14, 517 A.2d 328 (where a landlord failed to disclose a material fact, tenant is entitled to restitution of the rent he paid for an apartment even though he had lived in it); [17] *Consumer Protection Div. v. Consumer Publishing Co.*, 304 Md. 731, 780–81, 501 A.2d 48 (1985) (allowing restitution even in the absence of direct evidence of consumer reliance on deceptive diet pill advertisements); CPA § 13–403(b)(1) (if, after an administrative hearing, the Consumer Protection Division finds by a preponderance of the evidence that the CPA was violated, it *must* issue an order taking affirmative action "including the restitution of money or property").

██ It necessarily also follows, and we so hold, that a franchisor may be held liable for restitution for its deceptive practices. The correct measure of restitution would be the sums spent by the consumer in reliance on the practice, whether paid to the franchisee or franchisor. Under the circumstances of this case, either may be held accountable. Thus, when the trial court found that Cottman as a franchisor was a merchant, and thus had indirectly engaged in deceptive practices, it should also have held that the money spent by consumers as a result of this deception be returned to them by Cottman. To find otherwise is an abuse

---

**17.** In *Attorney Gen. of Maryland v. Dickson*, 717 F.Supp. 1090, 1106 (D.Md.1989), the court opined:

> [T]he remedy ... is a remedy ... that encompass[es]. . . . that require[ment] [that] the plaintiffs ... tender back what was received, if not consumed or worthless, and if "tender-back" is possible.

Obviously, a consumer cannot "tender back" an inspection. Neither can a consumer "tender back" unnecessary repairs. Thus, while we do not adopt the *Dickson* finding, even under it restitution was appropriate.

of discretion. We note that to hold otherwise would make the restitution procedure meaningless in every case where something is provided, through deceptive practices, to those being deceived. That is not the intent of the restitution provision of the Act.

We reverse the denial of the State's request for restitution, and we remand for the institution of a "procedure for the individual determination of consumer restitution claims." *Consumer Protection,* 304 Md. at 781, 501 A.2d 48; *State v. Andrews,* 73 Md.App. 80, 533 A.2d 282 (1987).

## COUNT 2

■■■ Count 2 involves a dispute over the sale of "preventionary" overhauls, and Cottman's participation in the process. The State alleged that Cottman induced customers to authorize and pay for unnecessary repairs.[18] The primary methods used, the State argues, are Cottman's sales instructions to its repairs centers that customers are to be told (1) that the transmission needs an overhaul if the transmission fluid is discolored (the "burnt fluid" technique); and (2) if a transmission is leaking, the staff is to recommend a "preventionary overhaul" even where the leak may be fixed by a simple resealing. The trial judge granted summary judgment for Cottman.

We think that there is a dispute of material fact regarding the sale of unnecessary repairs. For example, a manual authored by Chrysler Motors, and included in the record, states:

Along with the fluid level, it is equally important to check the condition of the fluid. *When the fluid smells burned* or if it is contaminated with metal bushing or friction material particles, *a complete overhaul is needed.*

(Emphasis added.) This view of the solution to the problem contrasts with other evidence:

---

18. This is not to be confused with the allegations of fictional repairs we discuss in relation to Count 3.

Q. So your view would be, I take it, even if the fluid is slightly burnt or burnt for that matter, if the car drives okay you would or would not do an overhaul?

A. Would not.

The State must do more than merely prove that the centers sold unnecessary repairs. As we have shown in our discussion of agency *supra*, no principal/agent relationship between the repair shops and Cottman was proven. Thus, the State must prove that Cottman's participation violated the CPA as to .these "preventionary" overhauls. It cannot depend solely upon the contacts between Cottman's franchisees and the ultimate consumer. There is a dispute regarding this factual issue, with the State offering exhibits tending to prove that Cottman's requiring its centers to perform unnecessary repairs constituted a prohibited practice, and Cottman offering evidence to the contrary. "Even where the underlying facts are undisputed, if the undisputed facts are susceptible of more than one permissible factual inference, the choice between those inferences should not be made as a matter of law, and summary judgment should not be granted." *Heat & Power Corp. v. Air Products & Chemicals*, 320 Md. 584, 591–92, 578 A.2d 1202 (1990). If the facts are susceptible to more than one inference, as they are here, summary judgment is likewise not proper. *Finci v. American Cas. Co.*, 82 Md.App. 471, 478, 572 A.2d 1092, *cert. granted*, 320 Md. 636, 579 A.2d 281 (1990). *See also Arnold Developer v. Collins*, 318 Md. 259, 567 A.2d 949 (1990); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Doehring v. Wagner*, 80 Md.App. 237, 242, 562 A.2d 762, *rev'd on other grounds*, 315 Md. 97, 553 A.2d 684 (1989); *Bennett v. Baskin & Sears*, 77 Md.App. 56, 95–96, 549 A.2d 393 (1988).

We reverse the grant of summary judgment on Count 2, and remand for a resolution of this question by a trier of fact.

## COUNT 3

 This count alleged that Cottman had charged customers for repairs *it* had not made. We have affirmed the

trial court's finding on the agency question. Thus, we affirm his grant of this summary judgment issue in Cottman's favor, as we could find no evidence in the record that would create a dispute as to a material fact. While there may have been evidence that the centers may have charged for fictitious repairs, the trial court failed to find sufficient evidence that this was a practice imposed, or attempted to be imposed, on the repair centers by Cottman. There being no agency relationship, the centers were not acting on Cottman's behalf in this regard. We discern no error in that finding.

### COUNT 4

Count 4 concerns the allegations by the State that Cottman violated the ARFA and CPA by failing to give written estimates of parts and labor costs. The CPA is a generic statute, and in § 13–301(14)(vi) it incorporates ARFA's requirements as applicable. ARFA § 14–1002 provides, *inter alia*, that:

(a) ...

(1) Before beginning any repair work on a motor vehicle for which a customer is charged more than $50, an automotive repair facility shall give the customer on his request a written statement which contains:

(i) The estimated completion date; and

(ii) The estimated price for labor and parts necessary to complete the work

\* \* \* \* \* \*

(b) ... An automotive repair facility may not charge a customer without his consent any amount which exceeds the written estimate by 10 percent.

"Repair" is not defined in the ARFA. To effectuate the intention of the Legislature, we will assign the ordinary meaning to the word. *See Privette,* 320 Md. at 744–45, 580 A.2d 188; *D & Y, Inc.,* 320 Md. at 538, 578 A.2d 1177; *Taxiera,* 320 Md. at 480, 578 A.2d 761; *Brodsky,* 319 Md. at 98, 570 A.2d 1235; *Morris,* 319 Md. at 603, 573 A.2d 1346;

*Davis,* 319 Md. at 60, 570 A.2d 855; *Kaczorowski,* 309 Md. at 513, 525 A.2d 628. The common meaning of the term is "to restore to a good or sound condition after decay or damage; mend: *to repair a motor." The Random House Dictionary of the English Language* 1215 (unabridged ed. 1983) (italics in original). "Diagnosis," on the other hand, means "to ascertain the cause or nature of (a disorder, malfunction, etc.) from the symptoms: *The mechanic diagnosed the trouble that caused the engine knock." Id.* at 397 (italics in original). It seems obvious to us that a diagnosis is not the same as a repair.

The ARFA does not require Cottman or the repair shops to give written estimates before finding out what was wrong with each transmission. Cottman is thus not required under the ARFA to give a *written* estimate of repairs until after it has performed a diagnosis to its satisfaction, whether that be by external inspection only, or by both external and internal inspection. Because the ARFA mandates that a written estimate may not be exceeded by more than 10%, were we to hold otherwise, we would force Cottman to issue a written estimate forcing it to either inflate all its estimates to the theoretical maximum price, or to gamble that the external inspection was completely accurate.[19] We hold, therefore, that the judge was correct in ruling for Cottman on this count.[20]

### Adjudication vs. Rulemaking

Cottman argues that the minimum cost estimate formula required by the injunction is an effective change in existing

---

**19.** The provision contained in the ARFA that *requires parties to perform affirmatively* by giving written estimates is distinguishable from the CPA (and our prior holding herein) which *prohibits certain practices.* The former require the furnishing of correct information; the latter forbids the withholding of correct information or furnishing of incorrect information. Additionally, the ARFA requires that the affirmative information be given "upon request." The CPA, and our holding *in respect to it, does* not depend upon a consumer request.

**20.** This would be so regardless of the existence of an agency relationship.

law which formulates a rule of widespread application, and as such, is impermissible under *CBS, Inc. v. Comptroller of the Treasury*, 319 Md. 687, 575 A.2d 324 (1990). It contends that the formula must be promulgated by rulemaking, not adjudication.

The standard enunciated in *CBS* is that "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *Id.* at 696, 575 A.2d 324. There, the state comptroller changed the formula for apportionment of corporate nationwide income for state tax purposes. Prior to 1980, CBS had computed its Maryland taxes by using a three-factor formula prescribed by the Maryland Code. The factors were sales, payroll, and property. *Id.* at 689, 575 A.2d 324. In 1980, the comptroller decreed for the first time that advertising income be added to the sales factor. The Court stated that this change led to a substantially new policy which was generally applicable, and held that it should have been promulgated by rulemaking instead of adjudication. *Id.* at 699–700, 575 A.2d 324.

The Supreme Court of Hawaii, in *Shoreline Transp. v. Robert's Tours and Transp.*, 70 Haw. 585, 779 P.2d 868 (1989), recently penned a useful capsule description of the difference between rulemaking and adjudication:

Rulemaking is the process by which an administrative agency lays down new prescriptions to govern the future conduct of those subject to its authority; adjudication is the process by which the agency applies either law or policy, or both, to the facts of a particular case. Rulemaking is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy. Adjudication, conversely, is concerned with the determination of past and present rights and liabilities. Typically, it involves a determination as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action.

*Id.* In *Consumer Protection,* 304 Md. at 753–54, 501 A.2d 48, the Court of Appeals, in discussing the company's argument that the proper way for the Division to proceed was by rulemaking, opined:

> Courts have generally held that administrative agencies "[are] not precluded from announcing new principles in ... adjudicative proceeding[s] and that the choice between rule making and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974).

> As Justice Murphy said for the Court in *SEC v. Chenery Corp.,* ... [332 U.S. 194, 202–203 [67 S.Ct. 1575, 1580, 91 L.Ed. 1995] (1947) ]:

> > "The function of filling in the interstices of the Act should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.... Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule.

> > > \* \* \* \* \* \*

> > [T]he agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."

> For these reasons most courts have allowed agencies broad discretion in choosing whether to develop policy by rulemaking or adjudication.

> > \* \* \* \* \* \*

This Court has not addressed the question of when, if ever, an agency is required to proceed by rulemaking. Nonetheless, in the instant case it was clearly appropriate for the Division to proceed by adjudication, even under the restrictive view expressed in *Ford Motor Co. v. F.T.C.* [673 F.2d 1008 (9th Cir.1981)], *supra.* The Consumer Protection Division did not change existing law or even formulate rules of widespread application in this proceeding. The hearing officer and the Chief of the Division simply applied the statutory standards to the facts in the record.

(Citations omitted, footnotes omitted.) *See also Natural Resources Defense Council v. United States Envtl. Protection Agency,* 907 F.2d 1146, 1164 (D.C.Cir.1990); *Public Citizen v. Nuclear Regulatory Comm'n,* 901 F.2d 147, 158 (D.C.Cir.1990); *Miranda v. Nat'l Transp. Safety Bd.,* 866 F.2d 805, 808 (5th Cir.1989); *Matter of C.V.S. Pharmacy Wayne,* 116 N.J. 490, 561 A.2d 1160 (1989); *Metromedia, Inc. v. Director, Div. of Transp.* 97 N.J. 313, 478 A.2d 742 (1984); *Petition of Paterson Counseling Center,* 237 N.J. Super. 240, 567 A.2d 282, 285 (1989); *Mollinedo v. Texas Employment Comm'n,* 662 S.W.2d 732, 738 (Tex.App.1983).

The CPA is to be liberally construed and applied, § 13–105, and is intended to protect consumers by the establishment of minimum standards. *State v. Andrews,* 73 Md.App. 80, 84, 533 A.2d 282 (1987); *Klein v. State,* 52 Md.App. 640, 645, 452 A.2d 173 (1982), *cert. denied,* 295 Md. 440 (1983); § 13–102(b). It establishes that "[f]ailure to state a material fact if the failure deceives or tends to deceive" is a deceptive trade practice. Section 13–301(3). The formula imposed by the judge in the case at bar is an expression of this general policy of consumer protection, and logically flows from this standard by defining what a deceptive practice is, in the context of transmission repairs. Thus, the CPA enunciated a policy of general application. The trial judge considered that general policy, and applied it to the specific factual situation at hand. The court simply applied the statutory standards to the facts in the record.

*See McDonald v. Dep't of Banking and Fin.*, 346 So.2d 569, 581 (Fla.Dist.Ct.App.1977), *petition for review denied*, 361 So.2d 199 (Fla.Dist.Ct.App.1978) (Florida's Administrative Procedure Act requires rulemaking for policy statements of general applicability, but also recognizes the desirability of refining incipient agency policy through adjudication of individual cases); *Indiana Dep't of Envtl. Management v. AMAX, Inc.*, 529 N.E.2d 1209, 1212 (Ind.App.1988) ("A rulemaking function is distinguished from an adjudicatory function in that the former involves an element of generality and operates on a class of individuals or situations while an adjudication operates upon a particular individual or circumstance"); *Hamilton County Bd. of Mental Retardation and Developmental Disabilities v. Professionals Guild of Ohio*, 46 Ohio St.3d 147, 545 N.E.2d 1260, 1265 (1989) (the decision to proceed by rulemaking or adjudication to resolve a dispute lies in the informed discretion of the administrative agency). We perceive no error on this issue.

THE DENIAL OF THE APPELLANT'S REQUEST FOR RESTITUTION IN COUNT I IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; THE JUDGMENT ON COUNT 1 IS OTHERWISE AFFIRMED. THE GRANT OF SUMMARY JUDGMENT ON COUNT 2 IS REVERSED AND REMANDED FOR TRIAL; THE JUDGMENTS ON COUNTS 3 AND 4 ARE AFFIRMED; COSTS ARE TO BE DIVIDED 75% BY APPELLEE/CROSS–APPELLANT, 25% BY APPELLANT/CROSS–APPELLEE.